Opinion
BAXTER, J.
A jury convicted defendant Jonathan Keith Jackson of the first degree murder of Monique Cleveland (Pen. Code, § 187),[1] the willful, deliberate, and premeditated attempted murder of Robert Cleveland (§§ 664, 187), and being a felon in possession of a firearm (former § 12021, subd. (a)(1), now § 29800, subd. (a)(1)). The jury found true the allegations that defendant inflicted great bodily injury upon the attempted murder victim (§§ 12022.7, subd. (a), 1192.7, subd. (c)(8)), that he personally used a handgun in the commission of the murder and attempted murder (§§ 12022.5, subd. (a), 1192.7, subd. (c)(8)), and that a principal was armed with a *732 handgun in the commission of the murder (§ 12022, subd. (a)(1)). The jury also found true the special circumstance that the murder was committed while defendant was engaged in the commission or attempted commission of a robbery. (§ 211; former § 190.2, subd. (a)(17)(i), now § 190.2, subd. (a)(17)(A).)[2] The jury, however, was unable to reach a penalty verdict as to the murder conviction, and the court declared a mistrial. At the penalty retrial, the jury returned a verdict of death on the murder conviction. Appeal to this court is automatic. (§ 1239, subd. (b).)
As we explain below, we find no prejudicial error at the guilt or penalty phase of defendant’s trial. We therefore affirm the judgment in its entirety.
I. Facts
A. The Guilt Phase
Robert Cleveland (Robert) and his wife, Monique Cleveland (Monique), were shot during an attempted robbery at their residence. Monique was shot in the face and died. Robert survived gunshot wounds to his face, upper back, and abdomen. The evidence included Robert’s account of the crimes and testimony from two witnesses who heard defendant, at separate times, confess to the crimes.
1. The Prosecution Case
In June 1996, Robert and Monique lived in a remote area of Mead Valley. Robert was a drug dealer who regularly sold to members of the Mead Valley Gangster Crips, including defendant, whom Robert knew by the name “Valley J.” Robert conducted many drug transactions in his home and often hid drugs in a light fixture in a recessed part of the kitchen ceiling.
One night in June 1996, members of the Blanton family, who lived nearby, heard multiple gunshots. Shortly thereafter, they received a call from Robert asking for help. Robert had also called 911 to report the shootings.
Michael Blanton and his two daughters rushed to the Cleveland home, where they found Robert slumped on the back porch, bleeding from gunshot wounds. Robert could barely speak but said he had been shot by Valley J. *733 Monique was found in the hallway; she had been shot in the face and was already dead. Michael Blanton noticed that the plastic cover from the light fixture in the kitchen ceiling was on the ground.
When police officers arrived at the scene, Robert was struggling to remain conscious. He told the responding officers that Valley J. and two or three other individuals had tried to rob him, and that Valley J. had shot him. Inside the house, the police found “Vally J” written in blood on the kitchen floor. In the bedroom, the police located a phone book listing a number for “Valley J.”; that number corresponded to a phone at the house where defendant’s girlfriend lived. The police also discovered a package of rock cocaine in the light fixture in the kitchen. A total of $507 was found in two different pairs of pants belonging to Robert.
Robert underwent multiple surgeries to repair the gunshot injuries to his face, upper back, and abdomen. While recuperating in the hospital, Robert identified a photograph of defendant as Valley J.
During a search of defendant’s grandparents’ house, the police recovered a green folder with the written notation “Mista Valley Jay, MVGC Crips.” The folder contained paperwork bearing both defendant’s real name and the moniker “Valley Jay.” Defendant was later taken into custody in Los Angeles for drinking in public; he gave the arresting officer a couple of false names.
Robert was one of the three main witnesses in the guilt phase, and he testified as follows. On the night of the shooting, defendant came to Robert’s house in a minivan containing at least three other individuals. Defendant got out and knocked on the door. As Robert picked up his .45-caliber handgun and went to answer the door, he heard Monique go into the bathroom down the hall. Robert let defendant in and locked the door behind him. Defendant owed Robert $150 from a previous drug transaction and wanted to get additional drugs. Robert told defendant he did not have any drugs for him that night and said they could discuss the matter again the next morning. During the course of this conversation, Robert set his gun down on the kitchen counter.
As defendant walked toward the door to leave, he suddenly pulled out a gun and shot Robert in the face from one or two feet away. Robert fell to the floor and looked up to see defendant struggling with his gun, which apparently had jammed. As Robert started to pull himself up from the floor, defendant opened the door. One of defendant’s companions then entered and shot Robert in the side while saying, “Where’s the money? Where’s the drugs?” and “Let’s get the bitch too.” At least one other person also entered the house. When the men asked where the drugs were hidden, Robert pointed *734 to the light in the recessed kitchen ceiling and then heard the light cover hit the ground. Robert began losing consciousness and was only vaguely aware of hearing additional gunshots. He did not recall being shot a third time. After the men left, Robert regained consciousness. Thinking he was dying, Robert wrote defendant’s name in blood on the kitchen floor and then somehow managed to call for help. Although drugs and large sums of cash had been in the house, it appeared nothing was taken.
The second main witness was Kevin Jackson (Jackson), who was unrelated to defendant. Jackson testified that a day or two after the shooting, he was smoking marijuana with defendant and “Alex” and asked whether they had heard that Robert and Monique had been shot and killed. Defendant replied, “Yeah. So what?” A short time later, defendant told Jackson, “Don’t trip, but I did that.”
Defendant then described to Jackson a version of the events that largely tracked Robert’s testimony. Defendant said he had gone to purchase drugs from Robert, but there had been a dispute about the money defendant owed Robert. Defendant felt that Robert had “disrespected] ” him, and defendant decided “to take what he came for instead of paying for it.” Defendant left the house and went to the car where his friends were waiting. He told them he was going to “jack” Robert and “take everything [he] had.” Defendant returned to the house, and Robert answered the door holding a gun. When Robert put the gun on the counter, defendant pulled out his own gun. Robert was substantially bigger than defendant, and he jumped at defendant and tried to take defendant’s gun. Defendant had recently been hospitalized following a motorcycle accident and “couldn’t take a chance on [Robert] grabbing him,” so defendant stepped back and shot Robert. Defendant then let in his “homies,” and one of them told him to finish what he started. Defendant found Monique in another part of the house. While she was down on the floor, he grabbed her by the hair and asked her where the money was. Monique replied, “What money?” Defendant then “blew her brains out,” using a gun he had borrowed from one of his cohorts. During their conversation, defendant opened a nightstand drawer and showed Jackson the gun he used to shoot Robert.
The third main witness was Kevin Jackson’s younger brother, Donald Profit, who was 14 years old at the time of the crimes. Like defendant, Profit was a member of the Mead Valley Gangster Crips. Profit testified he was smoking marijuana with defendant one or two days after the crimes, when defendant told Profit he “messed up” and confessed to shooting Robert and Monique. Defendant said he shot Robert in the head because he “had to get paid” and shot Monique because he “didn’t want no witnesses.” Defendant and his cohorts then searched the house for drugs. Profit claimed defendant *735 told him he had taken eight ounces of “dope” from Robert. Profit later stated he had seen defendant with this quantity of drugs some two weeks before the shooting.
Two expert witnesses testified regarding the likely manner in which Monique had been killed. Dr. Joseph Choi, a forensic pathologist who performed the autopsy, testified the gun had likely been between two and four inches from her face when she was shot. In his opinion, Monique’s injuries indicated she had been lying facedown on the floor while the shooter stood over her, lifted her head by the hair, and shot her in the left cheek. Elissa Mayo, a senior criminalist with the California Department of Justice, analyzed the blood spatter at the crime scene. Based on that analysis, Mayo estimated that Monique’s head was no higher than two feet above the floor when she was shot.
2. The Defense Case
The defense rested without introducing any evidence.
B. The Penalty Phase
After convicting defendant of the charged crimes, the jury was unable to reach a penalty verdict. The following evidence was presented at the penalty retrial.
1. The Prosecution Case
The prosecution introduced evidence of the circumstances of the crime. As he did in the guilt phase, Kevin Jackson recounted the story defendant had told him shortly after the shooting. Testimonial evidence and an autopsy photograph established that Monique was one month pregnant when she was murdered.
Evidence concerning the circumstances of defendant’s prior convictions also was presented. Joseph Canada testified that in July 1991, he had pulled his car off to the side of the road to eat his lunch and then dozed off. When Canada awoke, he saw defendant, who appeared to be 16 years old, pointing a shotgun directly at Canada’s face from two to three feet away. Three other teenage males were pointing shotguns at Canada from a Jeep Cherokee parked approximately 10 to 15 feet away. Defendant demanded Canada’s wallet and keys and told him to lie facedown in the dirt. Canada thought he was going to die, but the teens drove off, taking Canada’s car along with the Jeep. Once they had gone, Canada mshed to a nearby house and called 911. Defendant and his accomplices were soon spotted and led the police on a *736 chase. They eventually surrendered after a two-hour standoff. The incident continued to affect Canada years afterward.
In July 1992, defendant and his cousin, Derrick Palmer, committed an armed robbery of a drugstore. While Palmer disarmed the store’s owner and took cash out of the register, defendant approached two store employees. One of these employees, Kenny Johnson, testified that defendant pointed a loaded gun at his face. Defendant then put his knee in Johnson’s back and jammed the gun into his neck so hard that it caused a blood clot. Defendant asked where the store cameras were, and Johnson replied there were no cameras. Defendant told Johnson: “When I count to three, if you don’t tell me, you’re dead.” Defendant counted to two, then ran away. Both Palmer and defendant were arrested after their mothers turned them in to the police.
In September 1994, two police officers stopped a car in which defendant was riding in the front passenger seat. When defendant exited the car, the officers discovered a loaded handgun on his seat. Defendant was arrested for being a felon in possession of a loaded firearm.
The prosecution also introduced evidence of the following altercations involving defendant while he was in jail or prison. In June 1995, James Ghan was a correctional officer at Mule Creek State Prison (Mule Creek), where there was tension between inmates in the Crips gang and inmates in the 415 gang. Ghan witnessed a group of six to eight 415 inmates rush across the prison yard to attack two or three Crips inmates. Other Crips ran to join the fray. Eventually as many as 18 people were involved in the brawl, which ended shortly after Ghan shot a 415 inmate who was kicking a Crips inmate in the head. Defendant was later identified as one of the Crips who participated in the brawl, although his role in the fight was unclear.
Correctional Sergeant Vern Nichols testified that in August 1995, defendant and two other Mule Creek inmates refused an officer’s order to “get down” after a fight had broken out between two inmates elsewhere in the prison. One of the three inmates told the officer, “Fuck you. We don’t have to get down,” but Nichols was not sure whether it had been defendant.
In November 1995, Correctional Officer Floyd Haynes saw defendant and another Mule Creek inmate fighting in the basketball court area of the prison yard. Haynes yelled at them to stop fighting and get down on the ground, which they did. Haynes was not sure what had prompted the fight.
William Rose, a correctional deputy with the Riverside County Sheriff’s Department, testified about an incident that occurred when defendant was being held in the Southwest Detention Center. On one occasion in September *737 1996, defendant refused an order to respond to the guards who were conducting a head count. When defendant subsequently stepped out of his cell and was handcuffed, he used profanity and challenged the guards to a fight.
In June 1997, Correctional Officer Jerry Baker broke up an altercation between defendant and inmate Robert Mayo in defendant’s cell at the Robert Presley Detention Center. Mayo claimed that he had gone into defendant’s cell after the two argued while playing basketball, and that defendant had “sucker-punched” him in the back of the head.
With respect to victim impact testimony, Monique’s cousin, Jeannette Bums, described Monique’s life and the impact of her death on their family.
2. The Defense Case
Four family members appeared on defendant’s behalf. Defendant’s maternal grandparents each testified that defendant’s father had little or no role in raising his son. Defendant’s grandfather also claimed that defendant, after getting out of prison, injured his head in a motorcycle accident and did not seem to be the same person afterward.
Defendant’s older brother, Antione Jackson (Antione), described in detail the circumstances of defendant’s upbringing. When Antione was five and defendant was four, their mother moved in with a man named Alonzo. Antione described the year during which they lived with Alonzo as “torture.” Antione and defendant saw Alonzo beat their mother many times. Defendant tried to defend his mother, but Alonzo would throw him across the room. Antione also recalled numerous times when he, defendant, and their mother were forced to accompany Alonzo on trips to steal cars. A short time after their mother moved them out of Alonzo’s house, Alonzo came to their grandmother’s home with his “flesh burning,” like he was “melting.” Alonzo eventually died from his bums.
After Alonzo was out of the picture, Antione and defendant were exposed to a great deal of violence. Their mother became abusive. She also moved them back and forth between neighborhoods affiliated with either the Crips or the Bloods, and children associated with the gangs often attacked them or challenged them to fights. Antione recounted his own early involvement in gangs and crimes, his extrication from his gang affiliations, and his later service in the army.
Defendant’s mother, Paula Rice, confirmed and expanded on much of the testimony by her parents and Antione. Defendant’s biological father *738 became a drug addict soon after defendant’s birth and had never been a part of his life. Rice spoke of the daily physical abuse she endured from Alonzo, which was regularly witnessed by, and sometimes involved, defendant. She also described the incredible lengths to which Alonzo would go to keep her under his control, and said he raped her in front of defendant on multiple occasions. Rice was able to move her family out of Alonzo’s house only after she responded to one of his regular beatings by stabbing him with a pair of scissors. Their relationship ended a few months later when he died from his bum injuries.
Subsequently, Rice regularly moved the family between gang-affiliated neighborhoods, which often resulted in her two sons being attacked. Rice also described her involvement in another abusive relationship when defendant was approximately 13 years old, and defendant’s attempts to physically defend her on multiple occasions.
II. Discussion
A. Use of Stun Belt at Trial
Defendant contends the trial court’s orders requiring him to wear a REACT[3] stun belt during his trial were an abuse of discretion and violated his constitutional rights to due process, effective assistance of counsel, and a reliable penalty phase trial. These alleged errors and constitutional violations, he claims, require reversal of his convictions and death judgment.
1. Governing Legal Principles
A trial court “ ‘has broad power to maintain courtroom security and orderly proceedings.’ [Citation.] On appeal, its decisions on these matters are reviewed for abuse of discretion.” (People v. Virgil (2011) 51 Cal.4th 1210, 1270 [126 Cal.Rptr.3d 465, 253 P.3d 553] (Virgil).) In People v. Duran (1976) 16 Cal.3d 282 [127 Cal.Rptr. 618, 545 P.2d 1322] (Duran), a case involving visible shackling, we held that “a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury’s presence, unless there is a showing of a manifest need for such restraints.” (Id. at pp. 290-291, italics added.) Federal law is in accord. (See Deck v. Missouri (2005) 544 U.S. 622, 624 [161 L.Ed.2d 953, 125 S.Ct. 2007] [federal Constitution “forbids the use of visible shackles . . . unless that use is ‘justified by an essential state interest’ . . . specific to the defendant on trial”].)
In Mar, supra, 28 Cal.4th 1201, we extended Duran's “manifest need” standard to the use of visible and nonvisible electronic stun belts. (Mar,
*739 Even though Mar was the first California opinion to hold Duran’s manifest need standard applicable to stun belts, we have applied the standard to cases tried before Mar was decided. (E.g., Virgil, supra, 51 Cal.4th at pp. 1269-1271; People v. Lomax (2010) 49 Cal.4th 530, 558-562 [112 Cal.Rptr.3d 96, 234 P.3d 377]; People v. Gamache (2010) 48 Cal.4th 347, 366-370 [106 Cal.Rptr.3d 771, 227 P.3d 342]; Mar, supra, 28 Cal.4th at pp. 1222-1223.) However, in cases where the trial predated Mar, we have not faulted the courts for failing to consider the potential physical harm and psychological impact of stun belts as part of the manifest need determination. (Virgil, supra, 51 Cal.4th at p. 1271 [observing Mar discussed these points to provide guidance in future trials]; Lomax, at p. 562; Gamache, at p. 367, fn. 7; Mar, at pp. 1225-1230.)
As we have explained, the unjustified use of a stun belt may adversely affect the fairness of a trial or the reliability of a judgment in various ways. Like shackles that are visible to the jury, visible stun belts “may erode the presumption of innocence because they suggest to the jury that the defendant is a dangerous person who must be separated from the rest of the community.” (People v. Hernandez (2011) 51 Cal.4th 733, 742 [121 Cal.Rptr.3d 103, 247 P.3d 167]; see Duran, supra, 16 Cal.3d at p. 290 [visible shackling will likely lead jurors to infer the defendant is a violent person].) Moreover, as in cases of forced shackling, the forced wearing of a stun belt may discourage the defendant from taking the stand, or may impair the defendant’s credibility if he or she decides to testify. (Mar, supra, 28 Cal.4th at pp. 1224—1225; Duran, at p. 296.) Additionally, “requiring an unwilling defendant to wear a stun belt during trial may have significant psychological consequences that may impair a defendant’s capacity to concentrate on the events of the trial, interfere with the defendant’s ability to assist his or her counsel, and adversely affect his or her demeanor in the presence of the jury.” (Mar, at p. 1205.)[4]
*740 In Duran, supra, 16 Cal.3d 282, and Mar, supra, 28 Cal.4th 1201, the respective trial courts failed to require a showing of manifest need before ordering the defendants to wear restraints while testifying. In Duran, we found it significant that, due to the erroneous order, the defendant was forced to wear visible wrist and anide restraints while exercising his right to testify. (Duran, at p. 296.) We also determined the defendant should have been “afforded a proper and full opportunity to cross-examine” a critical witness and was “denied a proper and full opportunity to explain why he fled” from the crime scene. (Id. at pp. 295-296.) Observing that the evidence inculpating the defendant did not compel a guilty verdict, and that the visible shackling damaged the defendant’s credibility in the eyes of the jury, we concluded the compounded effect of these errors required reversal of the judgment under People v. Watson (1956) 46 Cal.2d 818 [299 P.2d 243] (Watson). (Duran, at pp. 295-296.)
In Mar, the defendant was forced to wear a stun belt that was not visible to the jury. The defendant, however, had “clearly stated that the device made it difficult for him to think clearly and that it added significantly to his anxiety, and the trial transcript confirm[ed] that defendant was nervous while testifying at trial.” (Mar, supra, 28 Cal.4th at p. 1224.) “Moreover, defense counsel specifically noted that defendant was ‘afraid that somebody’s going to push the button,’ and in light of the circumstances that defendant was on trial for having caused an injury to a law enforcement officer and that the activation of the stun belt was to be controlled by another law enforcement officer, defendant’s expressed anxiety in this regard, even if not justified, [was] plausible.” (Id. at pp. 1224-1225.) Because of “the relative closeness of the evidence, the crucial nature of defendant’s demeanor while testifying, and the likelihood that the stun belt had at least some effect on defendant’s demeanor while testifying,” we concluded the error was prejudicial, even under the Watson standard. (Id. at p. 1225.) Thus, in both Duran and Mar, the respective records disclosed that the unjustified use of shackling and a stun belt had adverse effects that were not harmless.
In contrast to the situations presented in Duran and Mar, reversal of a judgment is unwarranted when the record on appeal is devoid of evidence that the unjustified use of shackles or a stun belt had any adverse effect. For instance, while restraints have the potential to bias jurors against the defendant (People v. Hernandez, supra, 51 Cal.4th at p. 742; Duran, supra, 16 Cal.3d at p. 290), their use may be harmless when there is no indication the jurors saw the restraints (see People v. Manibusan (2013) 58 Cal.4th 40, 85 [165 *741 Cal.Rptr.3d 1] (Manibusan) [finding of harmlessness based in part on circumstance that “[n]othing in the record suggests that any juror saw the belt. . .”]; People v. Foster (2010) 50 Cal.4th 1301, 1322 [117 Cal.Rptr.3d 658, 242 P.3d 105]; People v. Letner and Tobin (2010) 50 Cal.4th 99, 155 [112 Cal.Rptr.3d 746, 235 P.3d 62] (Letner) [“we do not presume the prospective jurors viewed the restraint, and there is no evidence in the record demonstrating they did observe it”]; accord, U.S. v. McKissick (10th Cir. 2000) 204 F.3d 1282, 1299 [refusing to presume prejudice where no evidence in record that any juror noticed the stun belt]).
Likewise, while restraints can impair a defendant’s ability to testify effectively (Duran, supra, 16 Cal.3d at p. 296), their use may be harmless when the defendant chose not to testify at trial, and there is nothing in the record suggesting a nexus between that decision and the forced wearing of the restraint. (Virgil, supra, 51 Cal.4th at p. 1271; see People v. Combs (2004) 34 Cal.4th 821, 838-839 [22 Cal.Rptr.3d 61, 101 P.3d 1007]; People v. Anderson (2001) 25 Cal.4th 543, 596 [106 Cal.Rptr.2d 575, 22 P.3d 347]; People v. Cox (1991) 53 Cal.3d 618, 652 [280 Cal.Rptr. 692, 809 P.2d 351].)
Finally, while shackles and stun belts certainly “have the potential to impair an accused’s ability to communicate with counsel or participate in the defense,” the erroneous imposition of those restraints may be harmless where the record “does not reveal that any such impairment occurred.” (People v. Ervine (2009) 47 Cal.4th 745, 773-774 [102 Cal.Rptr.3d 786, 220 P.3d 820] [shackling]; see Manibusan, supra, 58 Cal.4th at pp. 85-86 [stun belt]; People v. Howard (2010) 51 Cal.4th 15, 30 [118 Cal.Rptr.3d 678, 243 P.3d 972] (Howard) [stun belt]; Letner, supra, 50 Cal.4th at p. 156 [“no evidence in the record demonstrating that [the defendant’s] ability to participate was affected in any manner by his wearing the leg brace”]; People v. Wallace (2008) 44 Cal.4th 1032, 1051 [81 Cal.Rptr.3d 651, 189 P.3d 911] (Wallace) [no evidence that shackling caused defendant to suffer from mental impairment, physical pain, or obstruction of communication with counsel, or that it influenced his decisions regarding testifying]; People v. Combs, supra, 34 Cal.4th at p. 839 [noting no evidence or claim that the defendant’s leg restraints influenced him not to testify, or that the restraints “distracted him or affected his demeanor before the jury”]; accord, Weaver v. State (Fla. 2004) 894 So.2d 178, 196; Stanford v. State (2000) 272 Ga. 267 [528 S.E.2d 246, 249-250]; State v. Odenbaugh (La. 2011) 82 So.3d 215, 257-258; State v. Johnson (2006) 112 Ohio St.3d 210 [2006 Ohio 6404, 858 N.E.2d 1144, 1179-1180].)[5]
*742 2. Analysis
We turn to the facts in this case. Prior to defendant’s trial, which preceded Mar, supra, 28 Cal.4th 1201, defendant objected to being physically restrained and shackled during any of the court proceedings against him. At the time, the only published authority addressing a trial court’s discretion to order a defendant to wear a REACT stun belt was People v. Garcia (1997) 56 Cal.App.4th 1349 [66 Cal.Rptr.2d 350] (Garcia), which concluded that, unlike shackling, a stun belt was not a physical restraint requiring an on-the-record showing and finding of manifest need. (Id. at pp. 1355-1356 & fn. 1.) In light of Garcia, the prosecution responded to defendant’s objections with a request that defendant be required to wear a stun belt throughout the trial, or in the alternative, that defendant be given the option of wearing shackles instead. The prosecution supported its stun belt request by pointing to the allegations of the charged crimes and the incidents described in the statement of aggravation.
Based on a deputy’s assurance that having two deputies in the courtroom during defendant’s trial would provide adequate security, the court declined to order shackling and determined that a stun belt would not be necessary. The court ultimately required use of a stun belt after the sheriff’s department could not guarantee the presence of two deputies unless a belt were ordered.
When defendant first wore the belt in the courtroom, the court noted the belt had “a special safety guard” and stated that if problems were to “arise with comfort, or so forth,” defendant should “just let the deputies know at breaks. We will make him as comfortable as possible.” Defense counsel immediately stated the belt was uncomfortable for defendant and did not allow him to lean back in his chair, so the attending deputy worked to adjust the belt. Because the deputy thought defendant was concerned that leaning back would activate the belt, he assured defendant and the court that that would not happen. After the belt was adjusted and defendant was given a pillow, defendant said, “That’s a little better.” Later that day, defense counsel *743 reported to the court that defendant was “indicating for just this afternoon” that he was very uncomfortable because the belt seemed tighter than before. The court ordered the attending deputy to do whatever he could to make defendant comfortable, and the deputy agreed. When the court acknowledged during this exchange that “sitting backwards with the box at the hip . . . certainly can be uncomfortable,” defense counsel stated, “Judge, just so we’re clear, I think we resolved that problem. I think he’s just got it on too tight today.” After the belt was readjusted, the defense reported no additional complaints or concerns about the stun belt at the guilt phase or the first penalty trial.[6]
After the first jury could not reach a penalty verdict, a different judge was assigned to preside over the penalty retrial. The prosecution again requested use of a stun belt, and defense counsel objected on two grounds. First, counsel argued the belt was unnecessary because defendant had not done “anything in the past to exhibit any kind of unruly behavior or any disrespect to the Court or any staff.” Second, the belt was uncomfortable for defendant, and counsel was “worried about any unconscious grimacing or exhibitions of discomfort that [defendant] might make that might be misconstrued by the jury as a reaction to witness testimony or anything like that.” When counsel asked the court to instead consider ordering a leg brace, the court expressed its belief that shackling was “most offensive.” Upon determining that a leg brace would not sufficiently address its concerns “about the violent nature of [defendant’s] responses to people in authority,” the court approved use of a stun belt and ordered a pillow to alleviate defendant’s discomfort.
Defendant first contends the trial court abused its discretion in forcing him to wear the belt during the guilt phase because (1) having determined the belt would not be necessary if two deputies were available, the court should have ordered the sheriff’s department to provide two deputies instead of deferring to the department’s policy of not providing a second deputy unless a belt were ordered (see Mar, supra, 28 Cal.4th at p. 1218 [trial court must make its own determination of the manifest need for restraints and may not “abdicate^ this decision-making authority to security personnel or law enforcement”]); and (2) the court required use of the belt despite the absence of any on-the-record showing of nonconforming conduct by defendant (see id. at pp. 1220-1221).[7]
*744 Defendant further contends the trial court abused its discretion in ordering a stun belt for the penalty retrial because (1) as before, there was no on-the-record showing of nonconforming conduct by defendant, and the court instead relied on unsworn out-of-court statements of an unidentified bailiff in concluding the belt was necessary (see Mar, supra, 28 Cal.4th at pp. 1220-1221); (2) the court failed to consider defendant’s three-year record of courtroom cooperation; and (3) the court failed to consider less drastic alternatives to the stun belt, such as additional deputy presence in the courtroom (see id. at p. 1206 [“court should impose the least restrictive measure that will satisfy the court’s legitimate security concerns . . .”]).
In light of the People’s concession at oral argument that the trial court erred under Mar, supra, 28 Cal.4th 1201, we proceed directly to the issue of prejudice. As we shall explain, the record affirmatively dispels any notion of prejudice, leaving no reasonable possibility that defendant would have received a more favorable verdict had the trial court not required him to wear a stun belt. (People v. Brown (1988) 46 Cal.3d 432, 446-448 [250 Cal.Rptr. 604, 758 P.2d 1135] (Brown).)[8]
First, there is no evidence in the record that the jurors saw the stun belt at any time. Thus, there is no basis for finding that visibility of the belt may have biased the jurors’ perception of his character. (See People v. Foster, supra, 50 Cal.4th at p. 1322; Letner, supra, 50 Cal.4th at p. 155.) Second, defendant chose not to take the stand, and the record contains no suggestion the forced wearing of the belt played any role in that decision so as to inhibit his defense. (See Wallace, supra, 44 Cal.4th at p. 1051; People v. Cox, supra, 53 Cal.3d at p. 652.)
We next assess whether the stun belt had any other adverse effect on defendant. During the first trial, the only time defendant voiced complaints about the belt’s effects was on the first day he wore it. In the morning, he complained the belt was uncomfortable and would not allow him to lean back in his chair. In response, the court had the belt adjusted, offered defendant a different chair (which he declined), and provided him a pillow. That afternoon, defendant again indicated discomfort because of the stun belt. At that point, defense counsel clarified that defendant’s earlier difficulty with leaning back had been “resolved,” and that the issue that afternoon pertained merely to the belt’s feeling tighter to defendant than before. The stun belt was *745 readjusted, and the defense reported no additional complaints or concerns about the belt through the conclusion of the first trial.
At a hearing before the penalty retrial commenced, defense counsel expressed worry to the trial court that the stun belt might cause defendant to unconsciously grimace or exhibit discomfort that might be misconstrued by the jury as a reaction to witness testimony. As in the first trial, the court ordered defendant to wear the belt but made sure a pillow was provided to address the discomfort issue. The retrial proceeded to its conclusion without any defense claim or assertion that the stun belt was affecting defendant’s demeanor.
We observe that, at the outset of the first trial, the attending deputy said he thought defendant might be concerned that leaning back would activate the stun belt. Although the defense offered no indication that defendant actually had this worry, the deputy assured defendant and the court that leaning back would not activate the belt. Throughout the duration of both trials, the defense never once stated or suggested that the threat of electric shock affected defendant’s mental state or that the belt caused him to experience mental stress or impairment.
Justice Liu evidently agrees that the stun belt was not visible to the jurors, that it did not affect defendant’s decision not to testify, that it did not inhibit defendant’s ability to confer with counsel, and that it was not prejudicial at the guilt phase. Nonetheless, Justice Liu identifies two incidents as supporting his notion that the belt may have impaired defendant’s ability to maintain a positive demeanor before the jury at the penalty retrial. First, he contends the penalty retrial court made a remark that defendant “could have reasonably interpreted ... as a warning that the bailiff would activate the stun belt if defendant were to engage in any further verbal or nonverbal communication with his family.” (Cone. & dis. opn., post, at p. 796.) This, however, is pure conjecture. The record contains no indication that defendant construed the court’s remark in the manner suggested. The defense made no claim or objection that the remark had any effect on defendant’s demeanor or mental state, and this despite the fact that defense counsel readily complained when the belt was too tight or made it difficult for defendant to lean back. Even defendant’s appellate briefing makes no mention of the remark.
Second, Justice Liu notes that, at the first penalty trial, the defense moved to preclude the prosecution from commenting on defendant’s in-court demeanor, and the trial court agreed that, up to that point, “ ‘[t]he only real issue is lack of emotion ....’” (Conc. & dis. opn., post, at p. 795.) Although Justice Liu surmises that this exchange pertained to the stun belt’s effects, the defense offered no indication at trial that its motion had anything to do with *746 the belt; likewise, defendant’s appellate briefing makes no reference to the exchange. The transcript of the proceedings, read in context, shows that the exchange occurred while the prosecution was still presenting its case in aggravation, so it is hardly surprising that defendant may have sat impassively while testimony of the prosecution’s witnesses was being taken. Moreover, the thrust of the defense’s motion was that there was no foundation for negative prosecutorial comment on defendant’s demeanor or supposed lack of remorse, because there was no evidence of defendant’s acting out or inability to control himself in court. As indicated by its comment, the trial court agreed.
Neither of these incidents supports Justice Liu’s speculation that the stun belt may have caused defendant to exhibit any observable behavior that would have detracted from his defense. In fact, the record is to the contrary, affirmatively demonstrating the assessment of defense counsel that the jurors’ consideration of defendant’s courtroom demeanor would have a favorable effect on their penalty determination. Specifically, at each of the penalty trials counsel urged the court to give two special instructions that would have told the jurors their in-court observations of defendant could be considered in mitigation. When the court expressed skepticism about giving these instructions at the first penalty trial, defense counsel held fast and countered that case law permitted the jurors “to draw a humane perception of the defendant by his conduct, the way he looked.” Although the defense’s special instructions were refused at both penalty trials, the only reasonable inference that can be drawn from counsel’s vigorous efforts on this point is that the stun belt did not have the prejudicial effect urged by Justice Liu.
Howard, supra, 51 Cal.4th 15, is instructive under these circumstances. In Howard, the defendant claimed the trial court erred and violated his constitutional rights by requiring him to wear a stun belt without making the requisite finding of manifest need. Although we agreed the court’s order was error, we found it was not prejudicial even assuming application of the “reasonable doubt” harmless error test of Chapman v. California (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] (Chapman). (Howard, at p. 30.) There the record showed the defendant had made an extended statement to the court at sentencing that antipsychotic medication affected his mental state during trial. (Id. at p. 29.) Significantly, however, the defendant “made no reference to a stun belt or its effects on his demeanor.” (Ibid.) Therefore, we concluded, wearing the stun belt had “no appreciable effect on him, even by his own account” (id. at p. 30), and “the record affirmatively dispels any notion that he was prejudiced” (id. at p. 28). (See Manibusan, supra, 58 Cal.4th at p. 86 [defendant’s psychological impact argument lacked any support in the record and was inconsistent with his express agreement to wear stun belt and his failure to mention the issue in his new trial motion].)
*747 A similar finding of harmlessness is warranted here. When defendant began wearing the stun belt, the trial court told the defense to let the deputies know if any problems were to arise with the belt. As the record reflects, defendant and his counsel identified only one complaint, namely, that the belt was uncomfortable to wear, either because it would not allow defendant to lean back in his chair or because it was too tight. A pillow was provided, and each time the defense spoke up, the court ordered adjustment of the belt in order to make defendant as comfortable as possible. Notably, the defense made no mention at either trial of the stun belt’s potential or actual effects on defendant’s mental state, and the record contains no hint that wearing the belt caused defendant to experience mental distress or that it inhibited his ability to confer with counsel and participate in his defense. Moreover, defendant’s current claim of prejudicial psychological impact is inconsistent with his complete failure to mention the stun belt or its effects in any of his various motions for a mistrial, a new guilt trial, and a new penalty trial. (See Manibusan, supra, 58 Cal.4th at p. 86.) Finally, any contention that the belt may have caused defendant to exhibit a negative demeanor is highly dubious given defense counsel’s on-the-record arguments that the jurors should be specially instructed that their in-court observations of defendant could be considered in mitigation.
Defendant claims his inability to turn around in his chair prevented him from seeing the prospective jurors at the penalty retrial and participating fully in the jury selection process. He also suggests his failure to face the prospective jurors may have alienated them. A fair reading of the reporter’s transcript discloses, however, that the stun belt had nothing to do with the circumstance that defendant could not see or face the prospective jurors. Rather, as defense counsel explained to the trial court, defendant had been specifically instructed to face forward at the counsel table and to not turn around at all, despite the unusual circumstance that the prospective jurors were all behind the counsel table. As soon as counsel brought this to the court’s attention, defendant was allowed to move to the end of the table. Once there, defendant could see the prospective jurors while still facing forward as instructed, and the defense made no further complaints along this line.[9] Thus, any claimed interference and alienation during the jury selection process cannot be attributed to the stun belt.
*748 In sum, there is no evidence that the stun belt was visible to the jurors or that it affected defendant’s decision not to testify. Likewise, there is no indication the belt caused defendant mental anxiety or inhibited his ability to confer with counsel and participate in his defense. There is, however, evidence that defense counsel viewed defendant’s demeanor as weighing in his favor during the penalty trial. Accordingly, the record affirmatively dispels any notion of prejudice, leaving no reasonable possibility that defendant would have received a more favorable verdict had the trial court not required him to wear a stun belt. {Brown, supra, 46 Cal.3d at pp. 446-448; see Howard, supra, 51 Cal.4th at pp. 28, 30; Letner, supra, 50 Cal.4th at p. 156; People v. Ervine, supra, 47 Cal.4th at pp. 773-774; Wallace, supra, 44 Cal.4th at p. 1051; People v. Anderson, supra, 25 Cal.4th at p. 596; People v. Cox, supra, 53 Cal.3d at pp. 650, 652 [no prejudice found even where defense counsel complained the handcuff used on defendant was “ ‘very uncomfortable’ ”].)
Defendant, citing lower federal court decisions, argues the same error we recognized in Mar, supra, 28 Cal.4th 1201, violated his federal constitutional rights to due process, effective assistance of counsel, and a reliable penalty phase trial. However, neither we nor the United States Supreme Court has decided whether such state law error also implicates the federal Constitution. (See Howard, supra, 51 Cal.4th at p. 30; Mar, supra, 28 Cal.4th at p. 1225, fn. 7.) We need not decide the issue in this case. As this opinion explains, the record affirmatively dispels any inference of prejudice under Brown, supra, 46 Cal.3d 432. For the same reason, the People have satisfied their burden under Chapman, supra, 386 U.S. 18, to show that any federal errors are harmless beyond a reasonable doubt. (See Howard, at p. 30; see also People v. Gonzalez (2006) 38 Cal.4th 932, 961 [44 Cal.Rptr.3d 237, 135 P.3d 649] [“. . . ‘Brown’s “reasonable possibility” standard and Chapman’s “reasonable doubt” test ... are the same in substance and effect.’ ”].) Finally, as defendant’s counsel acknowledged at oral argument, we have held that a court’s abuse of discretion in requiring use of a stun belt is not structural in nature and is not reversible per se. (Howard, at p. 30, fn. 6.)
B. Guilt Phase Issue

First Degree Murder Conviction and Robbery-murder Special-circumstance Finding

The murder count and the sole special circumstance allegation were tried on the theory that defendant killed Monique while robbing or attempting to rob Robert. (Former § 190.2, subd. (a)(17)(i), now § 190.2, subd. (a)(17)(A).) The prosecution’s special circumstance verdict form, however, specified *749 robbery only, and omitted reference to attempted robbery. The jury returned that form, which expressly stated that the murder was committed while defendant was engaged in the commission of a robbery. Defendant claims the evidence fails to support the jury’s robbery-murder special-circumstance finding, because there is no evidence that anything was actually taken from Robert. Hence, he urges reversal of that finding, the first degree murder conviction, and the death judgment.
“ ‘On appeal, “ ‘we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.’ [Citation.]” [Citation.] In conducting such a review, we “ ‘presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.’ [Citation.]” [Citations.] “Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.” [Citation.] These same principles apply to review of the sufficiency of the evidence to support a special circumstance finding. [Citations.]’ [Citation.]” (People v. Harris (2013) 57 Cal.4th 804, 849 [161 Cal.Rptr.3d 364, 306 P.3d 1195].) The federal standard of review is in accord. (People v. Rodriguez (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618], relying on Jackson v. Virginia (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 99 S.Ct. 2781].)
We assume for the purposes of argument that the evidence was insufficient to establish that either defendant or his accomplices actually took anything from the Cleveland house. The prosecution, however, was under no obligation to prove that defendant had successfully completed a robbery, because both the first degree felony-murder conviction and the special circumstance finding could properly be premised on a finding that defendant had attempted to rob Robert. (See § 189; former § 190.2, subd. (a)(17)(i), now § 190.2, subd. (a)(17)(A).)
As the record discloses, it was made abundantly clear to the jury that the prosecution need only prove the murder had occurred during an attempted robbery. The information, which was read to the jury, alleged that defendant had committed murder while engaged in the commission or attempted commission of the crime of robbery. The jury received instructions on the elements of robbery and the elements of attempt. As to the charge of murder, the court instructed that the prosecution must prove “a human being was *750 killed; ... the killing was unlawful; and ... the killing occurred during the commission or attempted commission of a robbery.” (Italics added.) The court further instructed: “The specific intent to commit a robbery and the commission or attempted commission of such crime must be proved beyond a reasonable doubt.” (Italics added.) As for the special circumstance allegation, the jury was instructed to determine whether the murder “was committed while the defendant was engaged in the commission or attempted commission of a robbery,” and was cautioned that the special circumstance is not established if “the robbery or attempted commission of a robbery was merely incidental to the commission of the murder.” (Italics added.) Finally, the prosecution emphasized in closing argument that an attempted robbery was sufficient to support the charges against defendant. While conceding “at best it’s murky whether they got dope or money from that house,” the prosecution correctly explained, “there is no necessity that property is actually taken.”
Defendant acknowledges the evidence at trial was sufficient to prove Monique’s murder occurred during the attempted commission of a robbery. But, he argues, the special verdict form shows the jury expressly found true only that the murder was committed while defendant “was engaged in the commission of the crime of ROBBERY.” Thus, he reasons, the felony-murder conviction and the robbery-murder special-circumstance finding are invalid because the evidence is insufficient to prove a completed robbery. This contention is meritless.
The verdict form’s failure to reference an attempted commission of robbery did not serve to limit the charges against defendant. Nor did the jury’s return of that form restrict its finding to one of a completed robbery. “A verdict should be read in light of the charging instrument and the plea entered by the defendant. [Citations.] . . . [T]he form of the verdict generally is immaterial, so long as the intention of the jury to convict clearly may be seen. [Citations.]” (People v. Paul (1998) 18 Cal.4th 698, 706-707 [76 Cal.Rptr.2d 660, 958 P.2d 412]; see People v. Jones (1997) 58 Cal.App.4th 693, 710 [68 Cal.Rptr.2d 506] [“ 1 “A verdict is to be given a reasonable intendment and be construed in light of the issues submitted to the jury and the instructions of the court.” ’ ”].) As indicated, both the prosecution and the court told the jury to return the verdict form if it found true the robbery-murder special-circumstance allegation, and the court repeatedly instructed that the allegation could be found true if the prosecution proved the murder had been committed during the commission or attempted commission of a robbery. In returning the verdict form, the jury clearly manifested its intention to find true the allegation charged. That the form did not describe all of the circumstances under which the allegation could be proved is, under these circumstances, merely a technical defect that may be disregarded because “ ‘ “the jury’s intent to convict of a specified offense within the charges is *751 unmistakably clear, and the accused’s substantial rights suffered no prejudice.” ’ ” (People v. Jones (2003) 29 Cal.4th 1229, 1259 [131 Cal.Rptr.2d 468, 64 P.3d 762].)
Defendant’s sufficiency of the evidence claim is rejected.
C. Penalty Phase Issues
1. Granting of Prosecution’s Challenge for Cause
At the penalty retrial, the trial court granted the prosecution’s request to excuse Prospective Juror J.C. for cause. Defendant contends this excusal violated the Sixth and Fourteenth Amendments to the federal Constitution under the standards established in Witherspoon v. Illinois (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] (Witherspoon) and Wainwright v. Witt (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844] (Witt). This claim is without merit.
Prospective Juror J.C.’s questionnaire responses indicated she had never given “much consideration” to the death penalty, although she believed it was imposed too often “against African-American males.” During voir dire, J.C. further explained her views, stating: “I wouldn’t say I’d be the first one to jump up and say give him the death penalty, no. You have to weigh options. But I don’t think I would be very likely to vote definitely for the death penalty.”
K.M. was in the same group of prospective jurors and was questioned in front of J.C. After ascertaining that gang members had recently killed K.M.’s cousin, the court asked if K.M. would “just keep flashing back to that situation” and whether that situation would “black out what you’re hearing in this trial?” K.M. responded, “It’s too fresh right now.” Because K.M. might have difficulty sitting through the proceedings, the parties stipulated to his excusal.
The prosecution thereafter asked the group of prospective jurors whether any of them did “not feel that they could in fact be a person who could participate in a verdict that will result in the death of [defendant],” and Prospective Juror J.C. raised her hand. When asked to explain her feelings about her ability to “be a juror in this case and to actually impose capital punishment,” J.C. stated: “I’m a widow. I’m a recent widow. 17 months ago I buried my husband. My husband died in my arms. I just can’t deal with death that well. No disrespect. I don’t want anything to do with this, sir.” The following exchange then occurred:
*752 “[Prosecutor]: It would be a personal hardship for you?
“Prospective Juror [J.C.]: Very much so.
“[Prosecutor]: Like [Prospective Juror K.M.]?
“Prospective Juror [J.C.]: Very much so.”
The prosecution later moved to dismiss Prospective Juror J.C. for cause. The defense submitted, and the court granted the motion.
“The federal constitutional standard for dismissing a prospective juror for cause based on his or her views of capital punishment is ‘ “[w]hether the juror’s views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” ’ (Uttecht v. Brown (2007) 551 U.S. 1, 7 [167 L.Ed.2d 1014, 127 S.Ct. 2218], citing [Witt, supra,] 469 U.S. [at p.] 424 . . . .)” (People v. Friend (2009) 47 Cal.4th 1, 56 [97 Cal.Rptr.3d 1, 211 P.3d 520].) “When the prospective juror’s answers on voir dire are conflicting or equivocal, the trial court’s findings as to the prospective juror’s state of mind are binding on appellate courts if supported by substantial evidence.” (People v. Duenas (2012) 55 Cal.4th 1, 10 [144 Cal.Rptr.3d 820, 281 P.3d 887].)
The voir dire of Prospective Juror J.C. amply supports the trial court’s decision to excuse her. Although initially she gave little indication that anything would prevent her from serving as a juror, she later stated, clearly and unequivocally, that she would be impaired. J.C. raised her hand when asked whether anyone could not participate in a verdict sentencing defendant to death, and proclaimed she did not “want anything to do with this.” She also affirmed that her situation was similar to that of Prospective Juror K.M., who had indicated a recent tragedy would make him unable to listen to and weigh the evidence presented at trial. J.C.’s voir dire responses furnished substantial evidence of her inability to perform her duties as a juror.
To the extent defendant claims the trial court erred because Prospective Juror J.C. appeared impaired by the recent death of her husband and not by her views about capital punishment, defendant misunderstands Witt and Witherspoon. Those decisions limit the extent to which jurors may be excused for cause because of their views on capital punishment, but they do not hold such views are the only grounds on which a challenge for cause may be granted. (See Witt, supra, 469 U.S. at pp. 421-424; Witherspoon, supra, 391 U.S. at pp. 522-523.) Whether J.C.’s expressed inability to perform the duties of a juror was due to the death of her husband, or was instead based on her general views about the death penalty, her responses affirmed she was *753 unable to consider and render a death verdict if appropriate. The trial court did not err in excusing her for cause.
2. Admission of Defendant’s Postarrest Statement
Over defendant’s objection, the trial court allowed Los Angeles Police Officer Damon Aoki to give the following testimony at the penalty retrial. More than a month after the instant crimes, Officer Aoki approached defendant and several members of the 8 Trey gang who were drinking in public. Aoki took defendant into custody after he gave Aoki a false name. Although defendant gave another false name at the police station, a subsequent fingerprint check revealed defendant’s true identity and also the arrest warrant for the murder. At some point, defendant, who was handcuffed, told Aoki that “if he had had a gun” when the officers had stopped him, “he would have had to shoot it out with [them] due to the fact that he had two strikes.” Despite presenting this testimony to the jury, the prosecution made no mention of it during closing arguments.
Although the record is somewhat unclear, the trial court apparently concluded that defendant’s statement that he would have shot the arresting officers had he had a gun was admissible to show defendant’s lack of remorse about Monique’s murder. On appeal, defendant maintains such evidence was irrelevant and highly prejudicial because postcrime evidence of remorselessness does not fit within any statutory sentencing factors. Thus, he claims, its admission violated both California law and his federal constitutional rights to due process, a fair trial, and a reliable penalty determination.
Although “[c]onduct or statements at the scene of the crime demonstrating lack of remorse may be considered] in aggravation as a circumstance of the capital crime under section 190.3, factor (a),” “ ‘postcrime evidence of remorselessness does not fit within any statutory sentencing factor . . . .’ ” (People v. Pollock (2004) 32 Cal.4th 1153, 1184 [13 Cal.Rptr.3d 34, 89 P.3d 353].) Because such evidence is irrelevant to aggravation, it generally is inadmissible unless introduced to rebut evidence of remorse presented in mitigation. (Id. at pp. 1184-1185.) Here, the People do not contend Officer Aoki’s testimony was admissible to demonstrate a lack of remorse.
Instead, the People invoke the settled rule that “ ‘ “a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason.” ’ ” (People v. Zapien (1993) 4 Cal.4th 929, 976 [17 Cal.Rptr.2d 122, 846 P.2d 704]; see People v. Brown (2004) 33 Cal.4th 892, 901 [16 Cal.Rptr.3d 447, 94 P.3d 574] [“If a judgment rests on admissible evidence it will not be reversed because the trial court admitted that evidence upon a different theory, a mistaken theory, or one not raised below.”].) The *754 People assert that, even if Officer Aoki’s testimony was not admissible to show defendant’s lack of remorse, it was properly admitted to show his consciousness of guilt. Defendant counters that, given the events preceding his statements to Aoki and defendant’s mention of his two strikes as the reason why he would want to shoot the arresting officers, it is unreasonable to infer anything about defendant’s supposed state of mind or his consciousness of guilt.[10]
Given the surrounding circumstances, including the fact that defendant falsely identified himself twice, a rational jury could view defendant’s statement about shooting it out with the arresting officers as reflecting defendant’s knowledge that he had committed two very serious crimes and his strong desire to evade capture. (See People v. Russell (2010) 50 Cal.4th 1228, 1253-1255 [117 Cal.Rptr.3d 615, 242 P.3d 68] [defendant allegedly stated he would shoot the police if they came]; People v. Dabb (1948) 32 Cal.2d 491, 495, 500 [197 P.2d 1] [when stopped by police, defendant started shooting immediately].) Although the record does not disclose why defendant chose to verbalize his thoughts to Officer Aoki, the circumstance that defendant used the term “two strikes” does not extinguish its tendency to show consciousness of guilt of the two Cleveland shootings, particularly since defendant may not have known what information the police had at the time. Because evidence that a defendant committed the crimes charged is one of the most crucial “circumstances of the crime of which the defendant was convicted” (§ 190.3, factor (a)), admission of the challenged testimony was not error. [11]
3. Admission of Evidence Concerning Victim’s Pregnancy
Over defendant’s objection, the trial court admitted testimony at the penalty retrial that Monique was approximately one month pregnant at the time of her death, as well as an autopsy photograph of the embryo. Defendant contends this was error because the evidence was irrelevant and unduly prejudicial. He further argues that admission of the evidence violated his rights under the Eighth and Fourteenth Amendments and their California counterparts. We are not persuaded.
*755 “The Eighth Amendment to the federal Constitution permits the prosecution, in a capital case, to present evidence about the murder victim and the specific harm that the defendant caused as relevant to the jury’s penalty decision. [Citations.] In California, the prosecution may introduce evidence of the specific harm caused by a defendant’s crime at the penalty phase in aggravation as a circumstance of the crime (§ 190.3, factor (a)). [Citations.]” (People v. Jurado (2006) 38 Cal.4th 72, 130-131 [41 Cal.Rptr.3d 319, 131 P.3d 400] (Jurado).)
In Jurado, supra, 38 Cal.4th 72, we held that evidence of a murder victim’s pregnancy was admissible in the capital defendant’s penalty phase under section 190.3, factor (a). (Jurado, at pp. 130-131.) In so holding, we rejected the defendant’s contention that the evidence was irrelevant and so unduly prejudicial as to require exclusion. As we explained, the circumstance that the defendant had ended “the life of a healthy 17-week-old fetus [the victim] was carrying was part of the harm caused by defendant’s crime and thus was a legitimate, though emotional, consideration for the jury in making its penalty decision.” (Id. at p. 131.) Under Jurado, the admissibility of such evidence does not turn on a defendant’s knowledge of the pregnancy, because facts concerning the victim that are admissible as circumstances of the crime “are not limited to those known to or reasonably foreseeable by the defendant at the time of the murder.” (Ibid.)
Consistent with Jurado’s analysis, we conclude the evidence of Monique’s pregnancy was properly admitted as one of the circumstances of defendant’s crime and, contrary to defendant’s suggestion, the mere fact of her pregnancy was not so unduly prejudicial as to require exclusion.[12] That defendant terminated the existence of the one-month-old embryo Monique was carrying was undeniably a harm resulting from defendant’s crime and thus was a proper circumstance for the jury to weigh as part of its penalty deliberations. (Jurado, supra, 38 Cal.4th at pp. 130-131.)
Defendant contends Jurado’s analysis is not controlling here, because there was no evidence that anyone knew of Monique’s pregnancy. We cannot agree that the relevance of Monique’s pregnancy turns on whether it was known to anybody. Rather, its relevance stems from the circumstance that termination of Monique’s pregnancy was part of the specific harm caused by defendant’s crime, as well as the circumstance that the victim’s surviving family members *756 will feel the impact of that crime, whether or not they knew of the pregnancy beforehand. (See Jurado, supra, 38 Cal.4th at pp. 130-131.)
Defendant complains there was no showing that Monique’s pregnancy was planned or wanted, or that her pregnancy would not have ended in a miscarriage or abortion. No matter. The evidence remained relevant and admissible without such showings, though defendant was free to argue these matters to the jury to lessen the impact of the aggravating evidence.
Defendant next argues the admission of the autopsy photograph of the embryo was erroneous and an abuse of discretion under Evidence Code section 352. We disagree.
“A trial court has broader discretion to admit photographic evidence of the crime at the penalty phase than at the guilt phase. ‘This is so because the prosecution has the right to establish the circumstances of the crime, including its gruesome consequences (§ 190.3, factor (a)), and because the risk of an improper guilt finding based on visceral reactions is no longer present.’ ” (People v. Mills (2010) 48 Cal.4th 158, 205 [106 Cal.Rptr.3d 153, 226 P.3d 276].) “The prosecution [is] entitled to have the penalty jury consider the real-life consequences of defendant’s actions” and is not obliged to prove its case with “ ‘evidence solely from live witnesses.’ ” (People v. Solomon (2010) 49 Cal.4th 792, 842 [112 Cal.Rptr.3d 244, 234 P.3d 501].)
Here, the embryo photograph was sufficiently relevant to justify its admission. As defendant appears to acknowledge, there was no evidence that Monique was noticeably pregnant. But Dr. Choi, who conducted the autopsy, discovered an embryo about 10 millimeters in length (less than 0.4 inch) in the victim’s uterus and determined she had been one month into a pregnancy at the time of her death. Thus, the photograph served to demonstrate the basis for Dr. Choi’s opinion concerning Monique’s pregnancy and constituted evidence of a specific harm caused by defendant, i.e., the termination of its existence. (See Jurado, supra, 38 Cal.4th at pp. 130-131.)
Moreover, we cannot say, either as a legal or a factual matter, that the photograph was inadmissible because it added nothing of substance to Dr. Choi’s testimony. First, it is settled that prosecutors are not required to prove their cases with evidence solely from live witnesses. (People v. Solomon, supra, 49 Cal.4th at p. 842.) Second, and more to the point, the photograph had significant probative value in that it showed to the jury, more accurately than any testimony, the extent to which the embryo had begun to develop an identifiable head, spine, and extremities when its existence was extinguished. For some jurors, the photograph may have shown the embryo’s physical development was greater than what they gleaned from Dr. Choi’s testimony, *757 while for other jurors, the extent of development may have been less than what they had expected. Thus, the photograph not only corroborated Dr. Choi’s testimony, but it assisted each juror’s understanding of it. (See ibid.) The prosecution was entitled to ask the jury to consider the photographic evidence of the embryo’s development in weighing the harm caused by defendant and the loss to the victim’s family.
Finally, the trial court did not abuse its discretion in determining the probative value of the photograph outweighed any prejudicial effect. (See Evid. Code, § 352.) The photograph, which we have reviewed, is neither gory nor particularly disturbing. Moreover, as displayed to the jury, it was “redacted” so as to show a tightly cropped picture of the embryo with minimal inclusion of the surrounding tissue. The image of the four-week-old embryo is nothing like those of fetuses at far more advanced stages of development, which in other jurisdictions were found to have been erroneously admitted. (E.g., McCarty v. State (2002) 2002 OKCR 4 [41 P.3d 981] [where issue was viability of a 24-week fetus, photo of the fetus extracted from its mother’s body postmortem was misleading, highly inflammatory, and prejudicial]; Erazo v. State (Tex.Crim.App. 2004) 144 S.W.3d 487 [erroneous admission of photo of a 28-week fetus required reversal and remand for determination of harm]; Rolle v. State (Tex.App. 2012) 367 S.W.3d 746 [photo of a nearly six-month fetus erroneously admitted at guilt phase but found harmless].)
In sum, the photograph here was “neither unduly gruesome nor inflammatory,” nor was it “ ‘of such a nature as to overcome the jury’s rationality.’ ” (People v. Taylor (2010) 48 Cal.4th 574, 650 [108 Cal.Rptr.3d 87, 229 P.3d 12].) Accordingly, its admission at the penalty phase was not an abuse of discretion under Evidence Code section 352 and did not violate defendant’s constitutional rights.[13]
4. Admission of Autopsy Photograph of Monique Cleveland
During the penalty retrial, the prosecution sought to introduce an autopsy photograph of Monique in which her eyes were open. The prosecution *758 wanted to use this photograph to illustrate Dr. Choi’s anticipated testimony that bum marks on one of Monique’s eyeballs indicated her eyes were open when she was shot. In admitting the photograph over defendant’s objections, the court determined that the evidence was relevant to show Monique’s awareness of “her impending death at the hands of the defendant” and that it would not create a substantial danger of undue prejudice.
That Monique’s eyes were open at the time she was shot was a relevant circumstance of the crime (§ 190.3, factor (a)), and the photograph showing the burn marks on her eyeball assisted the jury in understanding Dr. Choi’s testimony on the matter (see People v. Solomon, supra, 49 Cal.4th at p. 842; People v. Erasure (2008) 42 Cal.4th 1037, 1054 [71 Cal.Rptr.3d 675, 175 P.3d 632]). The photograph was not unduly prejudicial simply because it demonstrated the manner in which defendant committed the crime. (See Erasure, at p. 1054.) Moreover, we have reviewed the photograph and find nothing especially gmesome or inflammatory about it. Accordingly, the court acted within its broad discretion in admitting the photograph, and defendant was not deprived of due process or a reliable capital sentencing determination. (See id. at pp. 1054-1055.)
5. Admission of Victim Impact Evidence of Defendant’s Prior Crimes
Over defendant’s objection, the trial court admitted victim impact evidence regarding defendant’s prior armed robbery and carjacking of Joseph Canada and his armed robbery at a drugstore involving store clerk Daila Llamas. Both Canada and Llamas testified about the fear they felt during the robberies and its lasting effect. Defendant claims the court erred in admitting such testimony under section 190.3, factor (b) (factor (b)). Defendant is wrong.
Evidence is admissible under factor (b) when it shows that the defendant engaged in criminal activity that violated a penal statute and involved “ ‘the use or attempted use of force or violence or the express or implied threat to use force or violence’ . . . directed at a person.” (People v. Thomas (2011) 52 Cal.4th 336, 363 [128 Cal.Rptr.3d 489, 256 P.3d 603].) It is settled that “the circumstances of the . . . violent criminal conduct, including its direct impact on the victim or victims of that conduct, are admissible under factor (b).” (People v. Demetrulias (2006) 39 Cal.4th 1, 39 [45 Cal.Rptr.3d 407, 137 P.3d 229]; see People v. Jones (2012) 54 Cal.4th 1, 73 [140 Cal.Rptr.3d 383, 275 P.3d 496] (Jones).) We decline defendant’s request to reconsider our case law and conclude the challenged evidence was properly admitted. Having so concluded, we reject defendant’s related claim that erroneous admission of the evidence contravened the Eighth Amendment. (See Demetrulias, at p. 40, fn. 15.)
*759 6. Admission of Evidence of Prior Criminal Activity
As part of its case-in-chief, the prosecution introduced evidence of the following four instances of defendant’s prior criminal activity under factor (b): (1) his September 1994 arrest for being a felon in possession of a firearm; (2) his November 1995 fight with an inmate near the prison basketball court; (3) his June 1995 participation in a gang-related prison melee; and (4) his involvement in an August 1995 incident in which he and two other inmates refused a prison guard’s order to “get down.” Defendant contends the admission of this evidence was error and violated his due process rights, because these incidents did not involve “the use or attempted use of force or violence or the express or implied threat to use force or violence.” (Factor (b).)
The record is unclear, but it appears defendant may not have made these particular objections to the evidence of the first three incidents. In any event, evidence generally is admissible under factor (b) if it shows the defendant engaged in criminal activity that violated a penal statute and involved “ ‘the use or attempted use of force or violence or the express or implied threat to use force or violence’ . . . directed at a person.” (People v. Thomas, supra, 52 Cal.4th at p. 363.) The evidence must be sufficient to “allow a rational trier of fact to find the existence of such activity beyond a reasonable doubt.” (People v. Griffin (2004) 33 Cal.4th 536, 584 [15 Cal.Rptr.3d 743, 93 P.3d 344].) For the reasons below, defendant’s contentions as to all four incidents lack merit.
(a) Defendant’s Arrest for Being a Felon in Possession of a Firearm
Although “[possession of a firearm is not, in every circumstance, an act committed with actual or implied force or violence” such that it would be admissible under factor (b), “[t]he factual circumstances surrounding the possession . . . may indicate an implied threat of violence.” (People v. Bacon (2010) 50 Cal.4th 1082, 1127 [116 Cal.Rptr.3d 723, 240 P.3d 204].) As the testimony of two officers indicated, such circumstances were present here. Defendant was found in possession of a handgun during a stop of an automobile whose occupants were believed to be involved in gang-related activity. Defendant’s possession of this handgun was illegal because he was a convicted felon. When found on the seat where defendant had been sitting, the handgun was loaded with five rounds in the magazine and one in the chamber. On this record, “the jury legitimately could infer an implied threat of violence . . . .” (People v. Dykes (2009) 46 Cal.4th 731, 777 [95 Cal.Rptr.3d 78, 209 P.3d 1] [evidence of firearm possession properly admitted where its *760 possession without a permit was illegal, gun was loaded and ready to use, and the defendant had used a similar firearm in committing offense for which he was then on trial].)
(b) Defendant’s Fight with an Inmate Near the Basketball Court
Although the guard who witnessed the fight testified he did not know whether defendant was the aggressor, neither side offered any evidence suggesting that defendant’s participation in the fight was legally justified. “ ‘[Wjhere the prosecution’s evidence shows a jailhouse scuffle, the scene as witnessed does not suggest defendant may have been acting in self-defense, and defendant presents no evidence in mitigation, a finding of criminal assault is justified.’ ” (People v. Moore (2011) 51 Cal.4th 1104, 1136 [127 Cal.Rptr.3d 2, 253 P.3d 1153], quoting People v. Lucky (1988) 45 Cal.3d 259, 291 [247 Cal.Rptr. 1, 753 P.2d 1052].) Hence, the case law supports submission of this incident to the jury.
(c) Defendant’s Involvement in Prison Melee Between Rival Gangs
With regard to the gang-related prison melee, the evidence indicated defendant might have had a legal justification for any assault he committed, or perhaps not.
On the one hand, the evidence showed the fight began when members of the 415 gang ran across the yard toward certain members of the Crips gang, of which defendant was a member. Given this evidence, defendant could plausibly claim he was acting in self-defense or in defense of another.
On the other hand, Officer Ghan, who witnessed the melee, testified that the day before there had been multiple fights between Crips members and 415 members. On the day of the melee, Officer Ghan knew there was “trouble brewing” based on his observation of the prisoners’ “very unusual behavior” in the yard: Factions of both the Crips and the 415’s were milling around back and forth, and all other prisoners had vacated the area between these two groups. This testimony gave rise to a reasonable inference that the fight .between the Crips and the 415’s had been prearranged, and that prisoners involved on both sides had engaged in “ ‘mutual combat’ . . . pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities.” (People v. Ross (2007) 155 Cal.App.4th 1033, 1045 [66 Cal.Rptr.3d 438], italics omitted.) In this scenario, defendant’s participation in the mutual combat “may preclude reliance on self-defense to defeat a charge of assault, or similar offense, unless [he] took specific steps to desist *761 from the combat.” (Id. at p. 1043, fn. 11; see People v. Lucky, supra, 45 Cal.3d at p. 291 [“Voluntary mutual combat outside the rules of sport is a breach of the peace, mutual consent is no justification, and both participants are guilty of criminal assault.”].) Thus, evidence of the incident was admissible, and it was for the jury to decide whether defendant’s participation in the melee was legally justified or whether violent criminal activity had been proven.
Accordingly, with respect to the above three incidents, the evidence was sufficient to permit the jury to find the existence of prior criminal activity beyond a reasonable doubt. As to these three incidents, we reject defendant’s claims of error and further reject his derivative constitutional claims. (See People v. Kipp (2001) 26 Cal.4th 1100, 1134 [113 Cal.Rptr.2d 27, 33 P.3d 450].)
(d) Defendant’s Refusal to Obey Order
The evidence showed that defendant and two other inmates had temporarily refused a prison guard’s order to “get down,” and that one of the three inmates had said, “Fuck you. We don’t have to get down.” Even assuming such evidence did not demonstrate criminal activity involving the use or attempted use of force or violence, or the express or implied threat to use force or violence directed at a person, any error in its consideration by the jury was undoubtedly harmless. The evidence was not especially prejudicial, particularly since the guard acknowledged that the three inmates were not a “direct threat” to him, and the prosecution made no mention of the incident in its closing argument. In any case, given the properly admitted evidence of defendant’s coldblooded murder of Monique and attempted murder of Robert, his prior armed robberies, and his violent and assaultive conduct in other prison incidents, there is no reasonable possibility that presentation of this nonviolent incident affected the verdict. (See People v. Jackson (1996) 13 Cal.4th 1164, 1232 [56 Cal.Rptr.2d 49, 920 P.2d 1254] [nonviolent jail escape]; People v. Rodrigues (1994) 8 Cal.4th 1060, 1169-1170 [36 Cal.Rptr.2d 235, 885 P.2d 1] [threat to correctional officer]; Brown, supra, 46 Cal.3d at p. 449 [food riot, sexual misconduct, and possession of stolen wirecutters in jail].) Having rejected this state law claim, we likewise reject his derivative federal constitutional claims.
7. Alleged Prosecutorial Misconduct During Penalty Retrial Voir Dire
During voir dire of a panel that included three individuals who ultimately served as jurors, the prosecutor stated that defendant “sits here having been convicted of taking the life of another human being himself That is a verdict that was rendered by a jury, and you must accept it as true.” (Italics added.) *762 On appeal, defendant claims the prosecutor committed misconduct by falsely stating he had been convicted of having personally taken the life of another human being, when the prior jury’s verdict need not have been premised on a conclusion that defendant was the one who killed Monique.
“ ‘ “A prosecutor’s conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.” [Citation.] When a claim of misconduct is based on the prosecutor’s comments before the jury, as all of [the] defendant’s claims are, “ ‘the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.’ ” [Citation.] To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument. [Citation.]’ [Citation.] A failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm. [Citation.]” (People v. Linton (2013) 56 Cal.4th 1146, 1205 [158 Cal.Rptr.3d 521, 302 P.3d 927].)
Defendant unsuccessfully objected to the prosecutor’s statement as “improper voir dire.” The People, however, assert forfeiture of the claim because he failed to object on the precise ground asserted here.
Even assuming the claim had been preserved, we find no basis for reversal. While the prosecutor’s brief comment was misleading as to the guilt findings, the question of defendant’s precise role in Monique’s murder was left for the penalty jury to decide. After both sides rested their cases, the trial court specifically instructed the jury to “determine what facts have been proved from the evidence received in the trial and not from any other source.” The court emphasized to the jury that it “must not be biased” against defendant because he had been convicted of this offense, and that such circumstance was not “evidence of what your verdict must be.” The court also instructed that the attorneys’ statements were not evidence.[14] Consistent with these instructions, the parties based their closing arguments entirely on the evidence presented, and as relevant here, focused on the strengths and weaknesses of the prosecution’s theory that defendant personally shot and killed Monique. The defense urged the jury, without objection from the prosecution, *763 to consider the concept of lingering doubt and to carefully scrutinize whether any physical evidence actually supported the prosecution’s theory. Given these circumstances, there is no reason to think that the prosecutor’s brief comment during voir dire would have affected the penalty deliberations of the three jurors who heard it. Thus, the challenged comment did not infect the trial with unfairness or mislead the jury as to its role in sentencing. (People v. Linton, supra, 56 Cal.4th at p. 1205.) Nor is there a reasonable likelihood that the jury applied the remark in an improper or erroneous manner. (Ibid.)
Finally, defendant contends the challenged comment was part of a pattern of prosecutorial misconduct, citing six other incidents in which the prosecutor allegedly acted inappropriately. Defendant raises a separate challenge to one of these six incidents, which we discuss below. (See pt. II.C.8., post [examination of Kevin Jackson].) To the extent, however, that defendant challenges the remaining five incidents as additional examples of prosecutorial misconduct, he has forfeited review of each of these claims by his failures to object and request admonitions below. (People v. Linton, supra, 56 Cal.4th at p. 1205.) In any event, none of the cited incidents related to the prior jury’s findings, and none affects our conclusion that the prosecution’s fleeting comment in voir dire did not deprive defendant of a fair trial.
8. Alleged Prosecutorial Misconduct During Examination of Kevin Jackson
During defense counsel’s cross-examination of prosecution witness Kevin Jackson, counsel impeached Jackson with certain testimony he gave while being cross-examined previously during the guilt phase. Jackson responded: “I was allowing you to put words in my mouth then.” When counsel asked if the district attorney had “put any words into your mouth,” Jackson answered no.
On redirect examination, the prosecution asked Jackson whether he had spoken with defense counsel since testifying at the guilt phase. Jackson responded: “I talked to him I believe Saturday of this month.” In response to further prosecutorial questioning, Jackson stated he felt defense counsel had tried to influence his testimony, but was not successful in doing so.[15]
On recross-examination, defense counsel asked Jackson: “What did I say to you to try to influence your testimony?” Jackson responded: “You asked me *764 if—if I say anything nice about [defendant] would the D.A. pull back the deal that they have for me. And you asked me was there anything nice that I could say about [defendant]. You told me that—that [defendant’s] co-defendant had confessed to the murder but the D.A. just wanted to put [defendant] away for murder.”
In response to the prosecution’s further redirect questioning, Jackson indicated defense counsel had told him that someone other than defendant had confessed to Monique’s murder and that defendant was facing the death penalty. When asked if he thought counsel said such things to influence his testimony, Jackson answered in the affirmative.[16]
During the course of these exchanges, the defense registered no objection to any of the prosecution’s questions. Subsequently, defense counsel moved for a mistrial, explaining, “[F]or the prosecutor ... to put those kind of questions to Mr. Jackson in front of this jury and have him respond in a positive way I believe impugns my character, certainly is a cause for concern, or should be a cause of concern to [defendant] that this jury has now lost faith and credibility in me as his counsel.” The court denied the mistrial motion, stating, “[I]t appears to the Court . . . that the character and credibility and ethicality of the defense counsel has not been impugned.” The court, however, expressed its willingness, “in the event that [defense counsel] feels that his credibility is in any way impugned, for the Court to instruct the jury that the credibility ... of counsel for either side is simply not in issue, that counsel have a duty to represent their respective positions to the best of their ability and in any manner ethically proper for them to do, that there has been, in the opinion of the Court, no indication of any improper tactic or activity on the part of either counsel, and it shall not and must not enter into their deliberations . . . .” The defense declined the court’s offer to give a curative instruction.
Defendant now claims the prosecution committed misconduct in eliciting testimony from Kevin Jackson regarding his meeting with defense counsel and in insinuating that counsel had lied during that meeting in order to get Jackson to change his testimony. Even were we to overlook defendant’s failure to immediately object to the questioning as it was occurring, we will not disregard his refusal to accept the trial court’s offer to admonish the jury.
*765 Contrary to defendant’s claim, a request for an admonishment would not have been futile because the trial court explicitly stated it was willing to give one. Moreover, we reject defendant’s contention that the court’s proposed admonition would have been ineffectual. At worst, the prosecution’s questioning might have been understood to insinuate that defense counsel had lied to Jackson in an unethical effort to get him to slant his testimony in defendant’s favor. The proposed admonition would have addressed that insinuation directly by instructing the jury that neither counsel had engaged in any improper tactic or activity and that neither counsel’s credibility was at issue. Because such an admonition would have been more than sufficient to cure any possible harm caused by the prosecution’s vague insinuation, defendant’s refusal of the court’s offer renders the claim of misconduct unreviewable. (People v. Valdez (2004) 32 Cal.4th 73, 124-125 [8 Cal.Rptr.3d 271, 82 P.3d 296]; see People v. Linton, supra, 56 Cal.4th at p. 1205.) For the same reasons, the trial court did not err in denying defendant’s motion for a mistrial. (Cf. People v. Collins (2010) 49 Cal.4th 175, 198 [110 Cal.Rptr.3d 384, 232 P.3d 32] [“ ‘A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction.’ ”].)
9. Failure to Instruct on Meaning of “Personal Use” of a Firearm
At the outset of the penalty retrial, the clerk read to the jury the verdicts previously returned by the jury during the guilt phase of the trial. Included among those verdicts was the jury’s finding that defendant, “in the commission of the offense charged under Count I of the Information [(first degree murder)], did personally use a firearm, to wit, a handgun, within the meaning of Penal Code Sections 12022.5(a) and 1192.7(c)(8).” Defendant did not ask the court to further clarify the meaning of this or any other finding.
Defendant contends the trial court had a duty to instruct the penalty retrial jury, sua sponte, on the meaning of “personal use” of a firearm, as defined in CALJIC No. 17.19. (See People v. Mayfield (1997) 14 Cal.4th 668, 773 [60 Cal.Rptr.2d 1, 928 P.2d 485] [“Even in the absence of a request, a trial court must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury’s understanding of the case.”].) He claims the jury could have misconstrued the guilt phase jury’s “personal use” finding as a specific determination that defendant had fired the handgun in the course of committing the murder, even though the finding could have been based on some other firearm use by defendant, such as his intentional display of a firearm in a menacing manner, or his intentional striking or hitting of a human being with it. (See CALJIC No. 17.19.) Because the previous jury may have found defendant guilty of murder and found true the robbery-murder special circumstance without *766 necessarily finding he was the actual shooter, defendant contends a clarifying instruction was essential to a correct understanding of the personal use finding.
Defendant misinterprets our precedent regarding a trial court’s sua sponte duty to instruct the jury on principles of law. Significantly, he fails to cite any authority requiring a court, at the penalty phase, to instruct sua sponte regarding a verdict or finding rendered at the guilt phase. Of course, a sua sponte duty to instruct on particular principles of law may arise when the jury itself is called upon to apply those principles. (E.g., People v. Breverman (1998) 19 Cal.4th 142, 155-156 [77 Cal.Rptr.2d 870, 960 P.2d 1094] [lesser included offenses]; People v. Prettyman (1996) 14 Cal.4th 248, 266-267 [58 Cal.Rptr.2d 827, 926 P.2d 1013] [identification and description of uncharged target offenses under prosecution’s theory of criminal liability].) But here, the jury’s sole function at the penalty retrial was to decide whether defendant should be sentenced to death or to life imprisonment without possibility of parole, and its charge did not include mating a personal use finding. Accordingly, instructions on the meaning of “personal use” of a firearm, as defined in CALJIC No. 17.19, were not necessary for the jury’s understanding of the case.
This conclusion is consistent with the rule that applies when the prosecution offers evidence in aggravation of a defendant’s violent criminal activity. “In that context, we have long held that ‘[a] trial court has no sua sponte duty to instruct on the elements of “other crimes” offered under section 190.3, factor (b).’ [Citation.] Such instructions are ‘not vital to a proper consideration of the evidence on the issue of penalty’ [citation] because ‘the ultimate question for the sentencer is simply whether the aggravating circumstances, as defined by California’s death penalty law [citation], so substantially outweigh those in mitigation as to call for the penalty of death, rather than life without parole’ [citation].” (People v. Cottone (2013) 57 Cal.4th 269, 294 [159 Cal.Rptr.3d 385, 303 P.3d 1163].) As is often the case in that context, defense counsel here may reasonably have decided, for tactical reasons, against overloading the jury with instructions to illuminate the guilt phase verdict and findings, so that the jury might better focus on the central question of whether defendant deserved to live or die. (See ibid.)
To the extent defendant contends the trial court’s failure to explain the meaning of the guilt phase jury’s personal use finding was federal constitutional error, such claim also lacks merit. Contrary to defendant’s suggestion, there is no “reasonable likelihood” the penalty retrial jury understood the court’s instructions (or lack thereof) “in a way that prevented] the consideration of constitutionally relevant evidence” regarding the shooting of Monique. (Boyde v. California (1990) 494 U.S. 370, 380 [108 L.Ed.2d 316, 110 S.Ct. *767 1190].) As discussed more fully in part II.C.7, ante, no one argued or even suggested that the personal use finding constrained the jury’s ability to consider the evidence presented at the penalty retrial. To the contrary, both the court and the parties emphasized to the jury that it must make its own determination, based on the evidence before it, as to whether defendant personally shot and killed Monique. (Ibid.)
For similar reasons, the court’s failure to instruct on the meaning of the guilt phase jury’s personal use finding did not violate due process or render the penalty retrial fundamentally unfair. (See Estelle v. McGuire (1991) 502 U.S. 62, 72-73 [116 L.Ed.2d 385, 112 S.Ct. 475].) Even assuming the jury understood the finding in the manner defendant suggests, defendant was not deprived of a fair proceeding. There is no reason to think the jury would have given this factor undue weight or any weight at all. As noted, the court instructed the jury to make its own determination of the facts and to not be biased against defendant because of his conviction. (See pt. II.C.7., ante.) “We presume jurors ‘generally understand and follow instructions.’ ” (People v. Myles (2012) 53 Cal.4th 1181, 1212 [139 Cal.Rptr.3d 786, 274 P.3d 413].)[17]
10. Alleged Instructional Error
Defendant claims the trial court erred in refusing or failing to give a number of his specially tailored penalty phase instructions. As we have held repeatedly, “the CALJIC penalty phase instructions ‘ “ ‘are adequate to inform the jurors of their sentencing responsibilities in compliance with federal and state constitutional standards.’ [Citation.]” ’ ” (Jones, supra, 54 Cal.4th at p. 74.) Defendant acknowledges our repeated rejection of claims nearly identical to those he presents here, but asks us to reconsider our prior holdings. We decline to do so.
Defendant first argues the trial court erred in refusing to instruct the jury that it must consider death to be a more serious penalty than a sentence of life in prison without the possibility of parole. We disagree. Pursuant to CALJIC No. 8.88, the jury was instructed: “To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so *768 substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.” We “repeatedly have held that ‘there is no legal requirement that penalty phase jurors be instructed that death is the greater punishment, because the penalty trial itself and the jury instructions given, particularly CALJIC No. 8.88, make clear that the state views death as the most extreme penalty. [Citations.]’ [Citation.]” (Jones, supra, 54 Cal.4th at p. 81; see People v. Thomas, supra, 52 Cal.4th at pp. 361-362.)
Defendant next claims the trial court erred in refusing to instruct the jury that it “must not consider as an aggravating factor the existence of any special circumstance if you have already considered the facts of the special circumstance as a circumstance of the crimes for which the defendant had been convicted.” “When requested, a trial court should provide such an instruction. [Citation.]” (People v. McKinnon (2011) 52 Cal.4th 610, 694-695 [130 Cal.Rptr.3d 590, 259 P.3d 1186].) But “. . . CALJIC No. 8.85 does not inherently encourage the jury to ‘double count’ the same facts . . .” (McKinnon, at p. 695), and “ ‘the absence of an instruction cautioning against double counting does not warrant reversal in the absence of any misleading argument by the prosecutor’ ” (People v. Young (2005) 34 Cal.4th 1149, 1225-1226 [24 Cal.Rptr.3d 112, 105 P.3d 487]). Here, the prosecution made no such misleading arguments. Therefore, we find “ ‘no reasonable likelihood that the jury unconstitutionally applied CALJIC No. 8.85.’ [Citation.]” (Jones, supra, 54 Cal.4th at p. 77.)
Defendant also claims the trial court erred in refusing to give a proposed instruction informing the jury that its task at the penalty phase differed from that at the guilt phase, insofar as a penalty phase juror must render an “individualized, moral determination.” Because this instruction was duplicative of other instructions given to the jurors—including instructions that they could consider “any sympathetic or other aspect of the defendant’s character or record” (CALJIC No. 8.85) and were “free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider” (CALJIC No. 8.88)—the trial court did not err. (Jones, supra, 54 Cal.4th at pp. 74-75; see People v. Butler (2009) 46 Cal.4th 847, 874 [95 Cal.Rptr.3d 376, 209 P.3d 596].)
Nor did the trial court err in refusing to give defendant’s proposed instructions defining what sort of evidence could be considered as mitigation. The first proposed instruction listed evidence the defense had introduced and stated such evidence could be considered in mitigation. This instruction was properly denied. Although instructions pinpointing the defense’s legal theories might be appropriate, a defendant is not entitled to instructions that simply highlight facts favorable to him. (See People v. Cook (2007) 40 Cal.4th 1334, 1364 [58 Cal.Rptr.3d 340, 157 P.3d 950]; People v. Gutierrez (2002) 28 *769 Cal.4th 1083, 1159 [124 Cal.Rptr.2d 373, 52 P.3d 572].) The other proposed instructions—which emphasized the unlimited scope of the mitigating factors of which the jury could take account—“were duplicative of other instructions given, particularly CALJIC Nos. 8.85, factor (k) and 8.88.” (Jones, supra, 54 Cal.4th at p. 82.) The court did not err in declining to give them. (Id. at pp. 82-83; Cook, at p. 1364.)
Likewise, the trial court did not err in refusing to instruct the jury that it had the discretion to return a verdict of life without the possibility of parole regardless of the evidence presented at the penalty phase. As we have previously held, such an instruction is not required because CALJIC No. 8.88 adequately conveys this principle. (See People v. McKinnon, supra, 52 Cal.4th at pp. 695-696.) For the same reason, the court did not err in failing to instruct sua sponte that if the jury found that mitigation outweighed aggravation, it must return a verdict of life without the possibility of parole. (People v. Linton, supra, 56 Cal.4th at p. 1211.)
The trial court also did not err in refusing to give defendant’s proposed instruction defining the term “life without the possibility of parole.” “[A] California penalty jury is instructed that one of the sentencing choices is ‘life without parole,’ and . . . this is a common phrase requiring no further definition.” (People v. Whisenhunt (2008) 44 Cal.4th 174, 226 [79 Cal.Rptr.3d 125, 186 P.3d 496].)
Nor did the court err in declining to give defendant’s proposed instructions regarding the role that mercy could play in the jury’s determination of defendant’s sentence. As noted, the jury was instructed that it could consider as mitigating any “circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant’s character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial” (CALJIC No. 8.85), and that it was “free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider” (CALJIC No. 8.88). “We repeatedly have held that a trial court need not give a specific ‘mercy instruction,’ even if requested, when the above quoted instmctions are given [citations], and we reaffirm that conclusion here.” (People v. Hughes (2002) 27 Cal.4th 287, 403 [116 Cal.Rptr.2d 401, 39 P.3d 432].)
Finally, defendant claims the trial court erred in refusing to give his proposed instruction on lingering doubt. “Although it is proper for the jury to consider lingering doubt, there is no requirement, under federal or state law, that the jury specifically be instructed that it may do so, even if such an instruction is requested by the defendant.” (Jones, supra, 54 Cal.4th at p. 84, *770 and cases cited.) Such an instruction was not required here, because the “[ijnstructions to consider the circumstances of the crime (§ 190.3, factor (a)) and any other circumstance extenuating the gravity of the crime (id., factor (k)), together with defense argument highlighting the question of lingering or residual doubt, suffice to properly put the question before the penalty jury.” (People v. Demetrulias, supra, 39 Cal.4th at p. 42.)
11. Denial of Application to Modify Verdict
More than two months after the jury returned a verdict of death, the trial court denied defendant’s automatic application for modification of the death sentence. Although defendant contends the denial was improper, he failed to object below to any aspect of the court’s reasoning in denying the application. Defendant has therefore forfeited review of this claim. (People v. Zambrano (2007) 41 Cal.4th 1082, 1183 [63 Cal.Rptr.3d 297, 163 P.3d 4].)
In any event, defendant’s contentions lack merit. In ruling on an application for modification of a death verdict, “the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury’s findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings.” (§ 190.4, subd. (e).) “ ‘On appeal, we subject a ruling on such an application to independent review: the decision resolves a mixed question of law and fact; a determination of this kind is generally examined de novo [citation]. Of course, when we conduct such scrutiny, we simply review the trial court’s determination after independently considering the record; we do not make a de novo determination of penalty.’ [Citations.]” (People v. Carter (2005) 36 Cal.4th 1114, 1211 [32 Cal.Rptr.3d 759, 117 P.3d 476] (Carter).)
The court’s lengthy statement of reasons demonstrates it understood and complied with its obligation under section 190.4, subdivision (e). Defendant contends the court erred in considering in aggravation certain acts of violence which the court found had not been proved beyond a reasonable doubt. (See People v. Michaels (2002) 28 Cal.4th 486, 539 [122 Cal.Rptr.2d 285, 49 P.3d 1032] [evidence of a defendant’s prior criminal activity may not be considered as an aggravating factor unless it is proven “beyond a reasonable doubt that the conduct occurred and constituted a crime”].) But notably, in describing the evidence of defendant’s violent acts in prison and jail, the court stated: “The Court is not convinced that the evidence as to these acts rises to the level of proof beyond a reasonable doubt. Nevertheless, [defendant] was certainly a ready and willing participant in violent confrontations in custodial settings and tended to be very much in the ‘thick of things’ in such *771 activities.” The court’s statements regarding its consideration of these custodial incidents are somewhat ambiguous and could likely have been clarified had defendant offered a contemporaneous objection. However, the court’s comments during the course of its extensive review of the aggravating and mitigating evidence presented at trial demonstrate there is no reasonable possibility that any error affected its ruling. (See Carter, supra, 36 Cal.4th at p. 1211.) For the same reason, any asserted federal constitutional error was harmless beyond a reasonable doubt. (People v. Rogers (2006) 39 Cal.4th 826, 911 [48 Cal.Rptr.3d 1, 141 P.3d 135].)
Defendant further contends the trial court contravened our holding in People v. Davenport (1985) 41 Cal.3d 247, 289 [221 Cal.Rptr. 794, 710 P.2d 861], by improperly treating the absence of a mitigating factor as an aggravating factor. We cannot agree. In discussing potential mitigating evidence of defendant’s capacity to appreciate the criminality of his conduct (see § 190.3, factor (h)), the court stated: “There was none. There is no doubt that the defendant was able to and did understand the criminal wrongfulness of his conduct. Not only that, the defendant bragged the next day to Kevin Jackson that he had killed the two victims the previous day.” Nothing in this statement remotely suggests that the court improperly considered the lack of section 190.3, factor (h) evidence to be aggravating. Instead, the court plainly concluded that defendant’s ability to appreciate the criminality of his conduct was not a factor in mitigation, a conclusion it supported by reference to defendant’s statements to Kevin Jackson.
12. Lack of Intracase Proportionality
After the penalty retrial, the trial court denied defendant’s separately filed motion to bar the death penalty based on state and federal constitutional “intra-case proportionality principles and in the interest of justice.” Defendant renews his contentions here.
“ ‘ “To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant’s involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant’s acts. The court must also consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities. [Citation.] If the court concludes that the penalty imposed is ‘grossly disproportionate to the defendant’s individual culpability’ [citation], or, stated another way, that the punishment ‘ “ ‘shocks the conscience and offends fundamental notions of human dignity’ ” ’ [citation], the court must invalidate the sentence as unconstitutional.” [Citation.]’ [Citation.]” (Wallace, supra, 44 Cal.4th at p. 1099.)
*772 Defendant asserts that, contrary to the evidence presented at his trial, two of his partners in the instant crimes, Carl Bishop and Henry Jones, made statements to investigators suggesting that a fourth individual—Leon West, then at large—had been the one who had actually shot Monique. These statements, which were not made under oath or subject to cross-examination, reflected vagueness on Bishop’s part as to whether he actually saw West shoot Monique,[18] as well as an acknowledgement by Jones that he was in a different room when that shooting occurred. Not only did the trial court find Bishop’s hearsay statements unreliable, but it remains the case that Kevin Jackson’s trial testimony established, without contradiction, that defendant had boasted he shot Monique. In any event, as the court observed, even if defendant were only vicariously liable for Monique’s murder, he and his three cohorts “were all together in the criminality that preceded the execution-style killing” of the newly expecting victim, and defendant himself began the violence by shooting Robert in the face at close range.
Defendant also contends the extremely difficult childhood he endured militates against imposition of the death penalty. Although the circumstances of defendant’s early childhood were difficult and sympathetic, the traumatic events he experienced occurred nearly 17 years before the instant crimes and do not render his death sentence unconstitutional. Given the circumstances of defendant’s participation in the instant crimes and his prior violent criminality, defendant’s death sentence does not shock the conscience or offend fundamental notions of human dignity; nor is the sentence grossly disproportionate to his individual culpability. (Wallace, supra, 44 Cal.4th at p. 1099; see Tison v. Arizona (1987) 481 U.S. 137, 158 [95 L.Ed.2d 127, 107 S.Ct. 1676] [“major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the . . . culpability requirement” for imposition of capital punishment in felony-murder cases].)[19]
13. Constitutional Challenges to California’s Death Penalty Statute
Defendant raises a number of challenges to California’s capital sentencing scheme. We have previously rejected each of defendant’s contentions, and we adhere to those decisions, as follows.
*773 Penal Code section 190.2 is not impermissibly broad and adequately narrows the class of murders for which the death penalty may be imposed. (Jones, supra, 54 Cal.4th at p. 85; People v. Thomas (2011) 51 Cal.4th 449, 506 [121 Cal.Rptr.3d 521, 247 P.3d 886].) Section 190.3, factor (a), which defines the circumstances of the crime as one of the factors a jury may consider in determining the appropriate penalty, does not allow for the arbitrary and capricious imposition of the death penalty. (Jones, supra, at pp. 85-86; Thomas, at p. 506; People v. Cowan (2010) 50 Cal.4th 401, 508 [113 Cal.Rptr.3d 850, 236 P.3d 1074] (Cowan).)
“ ‘Allowing consideration of unadjudicated criminal activity under [section 190.3,] factor (b) is not unconstitutional and does not render a death sentence unreliable. [Citations.]’ [Citation.]” (Jones, supra, 54 Cal.4th at p. 87.)
“The trial court was not constitutionally required to inform the jury that certain sentencing factors were relevant only in mitigation, and the statutory instruction to the jury to consider ‘whether or not’ certain mitigating factors were present did not impermissibly invite the jury to aggravate the sentence upon the basis of nonexistent or irrational aggravating factors. [Citations.]” (People v. Morrison (2004) 34 Cal.4th 698, 730 [21 Cal.Rptr.3d 682, 101 P.3d 568]; see Jones, supra, 54 Cal.4th at p. 87.)
“ ‘ “The Eighth and Fourteenth Amendments do not require that a jury unanimously find the existence of aggravating factors or that it make written findings regarding aggravating factors.” [Citations.] “[N]either the cruel and unusual punishment clause of the Eighth Amendment, nor the due process clause of the Fourteenth Amendment, requires a jury to find beyond a reasonable doubt that aggravating circumstances exist or that aggravating circumstances outweigh mitigating circumstances or that death is the appropriate penalty. [Citations.]” ’ [Citation.] Moreover, the statute ‘ “is not unconstitutional because it does not contain a requirement that the jury be given burden of proof or standard of proof instructions for finding aggravating and mitigating circumstances in reaching a penalty determination.” ’ [Citation.] . . . Nothing in the United States Supreme Court’s recent decisions interpreting the Sixth Amendment’s jury trial guarantee (e.g., Cunningham v. California (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856]; Ring v. Arizona (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]; Apprendi v. New Jersey (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348]) compels a different answer to these questions. [Citations.]” (Cowan, supra, 50 Cal.4th at pp. 508-509; see Jones, supra, 54 Cal.4th at p. 86.)
“There is no violation of the equal protection of the laws as a result of the statutes’ asserted failure to provide for capital defendants some procedural guarantees afforded to noncapital defendants.” (People v. Alexander (2010) 49 *774 Cal.4th 846, 938 [113 Cal.Rptr.3d 190, 235 P.3d 873]; see People v. Thomas, supra, 51 Cal.4th at p. 507.)
Contrary to defendant’s contention, intercase proportionality review is not required by the Eighth Amendment to the federal Constitution. (Jones, supra, 54 Cal.4th at p. 87; People v. Thomas, supra, 51 Cal.4th at p. 506.)
Finally, “California does not employ the death penalty as a ‘ “regular punishment for substantial numbers of crimes” ’ [citation], and its imposition does not violate international norms of decency . . .” or the federal Constitution. (People v. Clark (2011) 52 Cal.4th 856, 1008 [131 Cal.Rptr.3d 225, 261 P.3d 243]; see People v. Blair (2005) 36 Cal.4th 686, 754-755 [31 Cal.Rptr.3d 485, 115 P.3d 1145].)
14. Cumulative Error
Defendant contends the cumulative prejudicial effect of the errors in both the guilt and penalty phases of his trial requires reversal of his conviction and sentence of death. We have rejected the vast majority of defendant’s assignments of error, and when we have found or assumed error, we have determined defendant was not prejudiced. Whether such claims are considered separately or together, we find no prejudicial error at either phase of the proceedings.
III. Disposition
The judgment of death is affirmed in its entirety.
Cantil-Sakauye, C. J., Kennard, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

 All further statutory references are to this code unless otherwise indicated.

 Additionally, it was determined at a bench trial that defendant suffered a felony conviction of robbery on October 19, 1992 (§§ 211, 667, subd. (a)), that defendant served a prison term for that offense and failed to remain free of prison custody and committed another offense resulting in a felony conviction within five years subsequent to the conclusion of that prison term (§ 667.5, subd. (b)), and that defendant’s October 19, 1992 robbery conviction was a serious and violent felony (§§ 667, subds. (c), (e), 1170.12, subd. (c)).

 “REACT” stands for “ ‘Remote Electronically Activated Control Technology.’ ” (People v. Mar (2002) 28 Cal.4th 1201, 1214 [124 Cal.Rptr.2d 161, 52 P.3d 95] (Mar).) *739 at pp. 1218-1220; see Virgil, supra, 51 Cal.4th at p. 1270.) In deciding whether use of a stun belt is justified, “ ‘the trial court may “take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.” [Citation.] These factors include evidence establishing that a defendant poses a safety risk, a flight risk, or is likely to disrupt the proceedings or otherwise engage in nonconforming behavior.’ [Citation.] Although the court need not hold a formal hearing before imposing restraints, ‘the record must show the court based its determination on facts, not rumor and innuendo.’ [Citation.]” (Virgil, at pp. 1270-1271.)

 Hence, while courts in trials predating Mar, supra, 28 Cal.4th 1201, were under no obligation to consider the potential psychological consequences before issuing a stun belt order *740 (id. at p. 1225, fn. 7), our prejudice analysis requires that we review the record for evidence that the unjustified use of a stun belt resulted in mental anxiety or distress that impaired the defendant’s right to a fair trial.

 In People v. Hill (1998) 17 Cal.4th 800 [72 Cal.Rptr.2d 656, 952 P.2d 673], we reversed a death judgment based in part on the trial court’s failure to independently assess whether the defendant posed a sufficient danger of escape to warrant shackling before the jury. (Id. at p. 846.) There, we did not review the record for evidence that the shackling—which was not *742 visible to the jury—adversely affected the defendant’s mental state, but simply noted the “possibilities of prejudice.” (Ibid.) Significantly, however, that defendant’s trial was rife with numerous other serious errors, including constant and outrageous prosecutorial misconduct; the court’s failure to excuse a bailiff from further courtroom duties after he testified against the defendant; the court’s failure to instruct the jury regarding the bailiff’s testimony; and instructional error under Carlos v. Superior Court (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]. (Hill, at pp. 844—847.) Considered together, the prosecutorial misconduct and trial court errors “created a negative synergistic effect, rendering the degree of overall unfairness to defendant more than that flowing from the sum of the individual errors.” (Id. at p. 847.) Because the circumstances in Hill were extraordinary, we do not view its shackling discussion as casting doubt on the prejudice analysis of the numerous other authorities cited above.

 The only other mention of the stun belt during the first trial occurred when the court and counsel addressed the security plans to be used when Robert, who allegedly harbored “very ill feelings” toward defendant for “shooting him in the face and killing his wife,” was to take the stand. A deputy explained that the plan was to have three deputies in the courtroom, one of whom, as usual, would be monitoring the REACT stun belt.

 Relying on Mar, supra, 28 Cal.4th 1201, defendant also complains the trial court erroneously failed to make any inquiry into potential psychological consequences and physical *744 effects in the event he were restrained with a stun belt. As discussed, however, Mar made clear its discussion regarding these inquiries was offered to provide guidance for future trials. (Id. at pp. 1225-1226, 1230.) Because defendant’s trial preceded the Mar decision by several years, the trial court was not required to foresee and discuss such concerns before issuing its order. (Virgil, supra, 51 Cal.4th at p. 1271; People v. Gamache, supra, 48 Cal.4th at p. 367, fn. 7.)

 We employ the test applicable to state law error at the penalty phase of a capital trial, because defendant claims the court’s ruling affected both the guilt and penalty phases.

 Defense counsel’s statements were as follows: “Yesterday it came to my attention that [defendant’s] instructions at counsel table are to face forward, not turn around at all. [][] Because this is an unusual proceeding where we have all the jurors behind us, I’m asking for permission to let him turn and be able to look at the jury, because I realized yesterday that he hasn’t seen any of these jurors. He’s not able to participate fully in helping me select this jury. And plus I don’t want to give the wrong impression to the jurors that he doesn’t care and he’s not going to turn around and be able to look them in the eye. So we have a conflict between .. ..” At that point the court suggested that defendant could sit at the end of the table, *748 where he would be facing forward at all times. The deputy readily agreed, and we may infer that the issue was resolved to everyone’s satisfaction.

 Defendant bases this contention on the following alleged circumstances: His statement was made more than a month after the Cleveland shootings; neither the statement itself nor anything leading up to it refers to those crimes; the statement was made after defendant had been arrested for drinking in public, not for murder; the statement was made before defendant was informed there was a murder warrant, and there was a different warrant out for his arrest at the time.

 Defendant’s derivative constitutional claims based on the introduction of this evidence fail to compel a different result. (People v. Lewis (2008) 43 Cal.4th 415, 531 [75 Cal.Rptr.3d 588, 181 P.3d 947].)

 Defendant points out the trial court described the pregnancy evidence as “highly prejudicial.” The court, however, was merely commenting that the evidence was highly adverse to defendant’s case, a circumstance that would not preclude its admission. (See People v. Salcido (2008) 44 Cal.4th 93, 148 [79 Cal.Rptr.3d 54, 186 P.3d 437], and cases cited.) Notably, the court overruled defendant’s Evidence Code section 352 objection, specifically finding the pregnancy evidence would not create “a substantial danger of undue prejudice or confusing the issues or misleading the jury.”

 The prosecution referred to the embryo as a “baby” or an “unborn” child several times during its closing argument. Citing these instances, defendant argues the prosecution “powerfully used the already potent photographic evidence, on top of the highly prejudicial testimony about the pregnancy itself, to make an emotionally-charged appeal to the jurors that was certain to have an inflammatory impact.” No basis for reversal appears. As discussed, Dr. Choi’s testimony and the cropped embryo photograph were relevant to the jury’s penalty decision and properly admitted. To the extent defendant asserts the prosecution’s various arguments were inflammatory and inappropriate, his failures to object and request admonitions forfeit review of the contention on appeal. (People v. Thomas (2012) 54 Cal.4th 908, 943 [144 Cal.Rptr.3d 366, 281 P.3d 361]; People v. Hamilton (2009) 45 Cal.4th 863, 958 [89 Cal.Rptr.3d 286, 200 P.3d 898].)

 We find no merit to defendant’s contention that his inability to cross-examine the prosecutor about the challenged remark implicated his Sixth Amendment right to cross-examine the witnesses against him.

 The reporter’s transcript reflects the following interchange between the prosecutor and Jackson: “[Question:] Did [defense counsel] say anything to you to try to influence your testimony here? [f] [Answer:] He just asked me a few questions about testimony I give today. [][] [Question:] I’m not asking you what he said. I’m just asking you if you felt he was trying to influence your testimony, [f] [Answer:] Yeah. Yes. Q] [Question:] Did he succeed in influencing your testimony? [f] [Answer:] No.”

 “[Question:] This defense attorney told you that someone other than [defendant] confessed to this murder? BO [Answer:] Yes. BO [Question:] Do you have any way of knowing if that’s a lie? H] [Answer:] No. BQ [Question:] Did you think that was intended to influence your testimony against [defendant]? BO [Answer:] Yes. Q] [Question:] Did he also tell you that [defendant] was facing the death penalty in an effort to influence you against testifying here? BO [Answer:] Yes.”

 Although, as defendant observes, the prosecution did represent in its opening statement and closing argument that defendant was the one who shot Monique, it did so entirely on the basis of the evidence presented during the penalty retrial. The defense countered by poking holes in the prosecution’s theory of the case, also based on the evidence before the jury. Given the court’s instructions and the parties’ respective arguments on the matter, there is no danger that the jury misunderstood its obligation to make its own evaluation of the facts or that the jury was unfairly influenced by any erroneous understanding of the previous jury’s factual determinations.

 Although Carl Bishop claimed at one point that he “[knew] for a fact” that Leon West shot the woman, he thereafter stated repeatedly that it was very dark in the hallway, that he had heard a shot, and that he had seen only a flash in the dark.

 We note defendant also urged the trial court to reduce his sentence on the ground that the prosecution did not seek the death penalty against the two other individuals charged with participating in the crimes of violence against the Clevelands. That contention lacked merit. “[I]ntracase proportionality review is ‘an examination of whether defendant’s death sentence is proportionate to his individual culpability, irrespective of the punishment imposed on others.’ [Citation.]” (People v. Hill (1992) 3 Cal.4th 959, 1014 [13 Cal.Rptr.2d 475, 839 P.2d 984]; see People v. Riel (2000) 22 Cal.4th 1153, 1223 [96 Cal.Rptr.2d 1, 998 P.2d 969].)