Filed 4/28/15  P. v. Yepez CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ARMANDO YEPEZ,<br><br>    Defendant and Appellant. | 2d Crim. No. B249483<br>(Super. Ct. No. F474383)<br>(San Luis Obispo County) |

Armando Yepez appeals a judgment following conviction of first degree murder, attempted premeditated and deliberate murder, street terrorism, and assault with a firearm (three counts), with findings regarding firearm, great bodily injury, and criminal street gang enhancements, and a prior serious felony strike conviction.  (Pen. Code, §§ 187, subd. (a), 189, 664, 187, subd. (a), 186.22, subd. (a), 245, subd. (a)(2), 12022.53, subd. (d), 12022.5, subd. (a), 12022.7, subd. (a), 186.22, subd. (b)(1), 667, subds. (b)-(1), 1170.12, subds. (a)-(d).)[1]  We modify the judgment to reflect imposition of six $40 court security assessments and six $30 criminal conviction assessments, but otherwise affirm. (§ 1465.8, subd. (a); Gov. Code, § 70373.)

*FACTUAL AND PROCEDURAL HISTORY*

Yepez is an admitted member of the "18th Street" criminal street gang, a Los Angeles gang with members in San Luis Obispo County.  The 18th Street gang members

---

[1] All further statutory references are to the Penal Code unless stated otherwise.

and the "Oceano 13" gang members are rivals. In 2007, Yepez stabbed an Oceano 13 gang member who had "punk[ed]" (disrespected) him. During his subsequent confinement in juvenile hall, Yepez confronted Oceano 13 gang member Michael Nunez; they "were always getting into it" and had "bad interactions."

In the fall of 2011, Nunez and a fellow gang member, Ivan Vargas, saw Yepez in an Oceano alley. Vargas and Yepez then physically fought; Vargas knocked Yepez to the ground three times. Before Nunez and Vargas drove away, Yepez threatened, "You know what time it is." Later that day, Nunez saw Yepez sitting in the backseat of an automobile that had pulled in front of him and stopped. Yepez held a handgun that was partially concealed by a T-shirt.

<em>Present Criminal Offenses</em>

On November 17, 2011, Yepez drove a tan-colored Toyota Avalon automobile that belonged to his girlfriend, Amanda Figueroa. Figueroa, Henry Ramos, and Erik Valdovinos were passengers. In the afternoon, they drove to a Santa Maria Target department store; security footage captured their visit and Figueroa's automobile. Later, Yepez dropped off Valdovinos and Figueroa in Nipomo.

Yepez had asked Valdovinos to arrange a cocaine purchase in San Luis Obispo. Yepez and Ramos drove to the Nipomo home of Ramos's brother-in-law, Leon Baltazar, to obtain money. During the drive, Yepez informed Ramos that he had a firearm under the backseat. Yepez asked Ramos to obtain another firearm, gloves, and clothing from Baltazar in order to rob a drug dealer. Baltazar gave them a knife, gloves, money, and clothing, but not a firearm. Yepez and Ramos then drove to Oceano to pick up Yepez's brother, a fellow gang member.

Meanwhile, Gabriel S., Joshua R., Ricardo C., Sammy Garcia, and Sammy Mota were playing "pick-up" football on the grounds of Oceano elementary school. When darkness fell, the boys walked to the front of Garcia's apartment building on 21st Street and stood near the mailboxes. As Yepez drove nearby, he saw the boys, stopped the automobile, and directed Ramos to "grab the heat," a .38 Special handgun, from

2

underneath the backseat.  Yepez stated:  "There's some Hoisters there," a derogatory reference to Oceano 13 gang members.

Yepez "rolled up" to the mailboxes and directed Ramos to roll down the passenger seat window.  Yepez yelled "fuck Oceano" and "fuck [H]oisters."  He then leaned over Ramos and fired the handgun five or six times.

The boys ran when they saw the gun flashes and heard the gunshots. Gabriel S. was shot in the head and Joshua R. was shot in the left leg and right ankle. Emergency police and medical assistance soon arrived, but Gabriel S. lay unconscious and dying.  Joshua R. later received surgery and treatment for his serious injuries.  The boys were neither armed nor had they displayed gang signs.

Yepez drove away.  Ramos discarded his shirt because it contained gunshot residue.  He also wiped the interior of Figueroa's automobile with urine believing that it would remove any gunshot residue.  Yepez placed the empty ammunition cases inside a latex glove and Ramos tossed the glove from the window.  That evening, Yepez used Figueroa's cellular telephone to send and receive calls and text messages.  Cellular tower data placed Figueroa's telephone in the Oceano area at the time of the shootings.

Yepez and Ramos eventually returned to Baltazar's residence in Nipomo. Ramos gave Yepez's firearm to Baltazar; he later buried the weapon in his backyard.

During their investigation, San Luis Obispo Sheriff's deputies recovered spent ammunition rounds in the driveway of Garcia's apartment building.  Forensic evidence established that the bullets could have been fired from a .38 caliber, .380 caliber, .357 caliber, or nine-millimeter gun.

Deputies also examined Figueroa's automobile and found Yepez's wallet and identification in the center console.  The dashboard and windows of the automobile had an unusual sheen and wipe marks.  Deputies found latex gloves in the back of the front passenger seat and Yepez's fingerprint on the edge of the front passenger window.  A forensic examination of portions of the automobile's headliner, rear passenger seat, and rear carpet revealed gunshot residue.

3

In a recorded interview, sheriff's deputies questioned Ramos. He initially denied knowledge of the shootings, but then stated that Yepez yelled "Fuck Oceano" and shot four or five times at the boys. Ramos explained that Yepez leaned over and fired the handgun through the front passenger window. Ramos stated that his brother-in-law "got rid of [the gun]."

At trial, Figueroa testified that Yepez drove her automobile and sometimes used her cellular telephone. In a recorded police interview, Figueroa stated that Yepez kept a revolver in a dresser drawer in his residence, and that he carried a firearm in his front waistband following the shooting. Following the shooting, Figueroa asked Yepez: "Where is your stupid gun?" He replied that it was at the home of a friend.

At trial, Figueroa stated that she lied during the police interview and that Yepez did not display a firearm. She also testified that she and Yepez sometimes went target shooting with a rifle that they fired from inside her automobile. Figueroa also admitted, however, that she was in a photograph depicting Yepez displaying an "18" gang sign.

*Yepez's Admissions*

In May, 2012, Ramos agreed to wear a recording device and speak to Yepez regarding the charged crimes. During their conversation, Yepez stated that he did not know that he was "going to shoot anybody," and that he did not feel remorse. Yepez also stated that he had been "droppin' niggas," but not like he shot Gabriel S. and Joshua R. The prosecutor played the recording at trial.

Following his arrest, San Luis Obispo Sheriff's Detective David Marquez interviewed Yepez. Yepez denied involvement in the shootings and claimed that he drove to Oceano that evening to visit his brother. When Marquez showed Yepez a photograph of Gabriel S.'s body, Yepez "started to smile."

*Expert Witness Gang Testimony*

Los Angeles Police Officer Winston Lee testified that the 18th Street gang is a large Los Angeles criminal street gang whose primary activities include murder, transportation of narcotics and firearms, burglaries, robberies, witness intimidation, and

4

rape. Lee opined that respect is an important gang culture value that is created by instilling fear in the community. A gang member who is "punked" would lose his credibility until he retaliates against the rival gang member to save face.

San Luis Obispo County Sheriff's Detective Michael Hoier testified that Yepez and his brothers are members of the 18th Street criminal street gang in San Luis Obispo County. Yepez has gang-related tattoos and a history of altercations with rival gang members. Other 18th Street gang members have committed and were convicted of predicate criminal offenses in San Luis Obispo County. The phrase "what time is it?" means that retaliation will ensue following the disrespecting of a gang member. Hoier was also familiar with members of the Oceano 13 criminal street gang, including Vargas and Nunez. Vargas is usually seen in the 21st Street area where the present shootings occurred. Hoier opined that Yepez committed the shootings to benefit his criminal street gang because the gang benefits from a reputation for violent retaliation.

*Conviction and Sentencing*

The jury convicted Yepez of first degree murder, attempted premeditated murder, street terrorism, and assault with a firearm (three counts). (§§ 187, subd. (a), 189, 664, 187, subd. (a), 186.22, subd. (a), 245, subd. (a)(2).) It also found that he personally: discharged a firearm resulting in great bodily injury, used a firearm, and inflicted great bodily injury; and, committed the criminal offenses to benefit a criminal street gang. (§§ 12022.53, subd. (d), 12022.5, subd. (a), 12022.7, subd. (a), 186.22, subd. (b)(1).) In a separate proceeding, the trial court found that Yepez suffered a prior serious felony strike conviction. (§§ 667, subd. (b)-(i), 1170.12, subds. (a)-(d).)

The trial court sentenced Yepez to a prison term of 158 years eight months, consisting of an indeterminate term of 130 years to life, and a determinate term of 28 years 8 months. It also imposed a $10,000 restitution fine, $10,000 parole revocation restitution fine (stayed), $40 court security assessment, and a $30 criminal conviction assessment, and awarded Yepez 390 days of presentence custody credit. (§§ 1202.4, subd. (b), 1202.45, 1465.8, subd. (a); Gov. Code, § 70373.)

5

Yepez appeals and contends that there is insufficient evidence that he harbored the specific intent to kill, a necessary element of murder and attempted murder. The Attorney General responds and also asserts that the trial court did not impose certain mandatory assessments.

## DISCUSSION

### I.

Yepez argues that there is insufficient evidence to support the judgment for first degree murder or attempted murder because there is not sufficient evidence that he intended to kill as he discharged the firearm.[2]  He relies upon his response to Ramos's question whether he struck any of the boys:  "No, and I don't care," and his later statement to Ramos, "I didn't know that I was going to shoot anybody."  Yepez asserts that his statements, uttered privately to a friend, are reliable direct evidence of his lack of intent to kill.

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether there is reasonable and credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Jackson* (2014) 58 Cal.4th 724, 749.)  Our review is the same in a prosecution primarily resting upon circumstantial evidence.  (*People v. Watkins* (2012) 55 Cal.4th 999, 1020.)  We do not redetermine the weight of the evidence or the credibility of witnesses.  (*People v. Albillar* (2010) 51 Cal.4th 47, 60; *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact"].)  We must accept logical inferences that the jury might have drawn from the evidence although we would have concluded otherwise.  (*People v. Streeter* (2012) 54 Cal.4th 205, 241.)  "If the circumstances reasonably justify the trier of fact's findings,

---

[2] Yepez concedes that there is sufficient evidence of premeditation and deliberation.  For this reason, we do not discuss the three categories of evidence relevant to establishing premeditation and deliberation, as set forth in *People v. Anderson* (1968) 70 Cal.2d 15, 26-27, and its progeny.

reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar*, at p. 60.)

A willful, deliberate, and premeditated killing with express malice aforethought is first degree murder. (§§ 187, subd. (a), 189; *People v. Chiu* (2014) 59 Cal.4th 155, 166.) Express malice is "an intent to unlawfully kill a human being." (*People v. Moon* (2005) 37 Cal.4th 1, 29; *People v. Mejia* (2012) 211 Cal.App.4th 586 604.) Intent to unlawfully kill and express malice are "'one and the same.'" (*People v. Smith* (2005) 37 Cal.4th 733, 739.) Express malice is established by evidence that the assailant either desired the resulting death or knew to a substantial certainty that death would occur. (*Ibid.*)

The crime of attempted murder also requires the specific intent to kill, in addition to the commission of a direct but ineffectual act toward accomplishing the intended killing. (*People v. Smith*, *supra*, 37 Cal.4th 733, 739.)

The trier of fact may infer intent to kill or express malice from the defendant's acts and the circumstances of the crime. (*People v. Smith*, *supra*, 37 Cal.4th 733, 741.) Rarely is there direct evidence of a defendant's intent; it must be inferred from his acts and the factual circumstances. (*Ibid.*) "[T]he act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice." (*Id.* at p. 742.)

Sufficient evidence and all reasonable inferences therefrom support the finding of intent to kill. From an idling automobile, Yepez fired a handgun at Gabriel S. and Joshua R., who stood a short distance away on the sidewalk. Bullets struck Gabriel S. in the head and Joshua R. in the legs. (*People v. Smith*, *supra*, 37 Cal.4th 733, 741 [purposeful use of a lethal weapon permits an inference of intent to kill].) Gabriel S. also was struck in a vital area of his body. Yepez fired the handgun five or six times, more times than would occur with an unplanned or accidental discharge, and he fired at Joshua R. as he ran to hide between parked vehicles. (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1463-1464 [dozen shots fired during "drive-by," far more than would

7

occur in unplanned shooting], disapproved on other grounds by *People v Mesa* (2012) 54 Cal.4th 191, 199.)

The jury considered and weighed Yepez's statements to Ramos regarding the shooting and found the statements of insufficient verity.  Moreover, Yepez's statement, "I don't care," may be interpreted to mean that he was not remorseful for Gabriel S.'s death and Joshua R.'s injuries.  Detective Marquez testified that when Yepez was shown a photograph of Gabriel S.'s body, Yepez "started to smile."  (Cf. *People v. Houston* (2012) 54 Cal.4th 1186, 1216 [defendant's smile during killings supports conclusion that killings were result of preexisting thought and reflection].)  In his conversation with Ramos, Yepez also casually admitted that he had "dropp[ed] niggas" before.

## II.

The Attorney General correctly points out that the trial court did not impose the proper court security assessments and criminal conviction assessments.  (§ 1465.8, subd. (a); Gov. Code, § 70373.)  These fees are mandatory and may be added on review.  (*People v. Rodriguez* (2012) 207 Cal.App.4th 1540, 1543, fn. 2.)  Yepez was convicted of six criminal offenses; the trial court is required to impose six $40 court security assessments ($240) and six $30 criminal conviction assessments ($180).

The judgment is modified to reflect imposition of six $40 court security assessments and six $30 criminal conviction assessments, but otherwise affirmed.  The trial court shall prepare an amended abstract of judgment and forward the amended abstract to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


GILBERT, P.J.

We concur:


YEGAN, J.


PERREN, J.

8

Ginger E. Garrett, Judge

Superior Court County of San Luis Obispo

_____

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell, Supervising Deputy Attorney General, Peggy Z. Huang, Deputy Attorney General, for Plaintiff and Respondent.