Filed 5/21/15  P. v. Joanou CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>STEPHEN TODD JOANOU,<br><br>    Defendant and Appellant. | 2d Crim. No. B256800<br>(Super. Ct. No. LA070501-01)<br>(Los Angeles County) |

Stephen Todd Joanou appeals a judgment following conviction of first degree murder, with a finding that he personally used a deadly weapon during commission of the crime.  (Pen. Code, §§ 187, subd. (a), 189, 12022, subd. (b)(1).)[1]  We affirm.

### FACTUAL AND PROCEDURAL HISTORY

On March 19, 2012, a movie crew filmed the movie, "Up All Night," at South Weddington Park in Studio City.  Oziel Martinez, a security guard employed by Reel Security, protected the film-making equipment and trailers that night at the park.

Shortly before midnight, Martinez saw a black automobile park on the street near the park.  Minutes later, a man and a woman wearing dark clothing left the automobile and walked across the park.  The couple had "serious" and not "friendly" expressions, and did not speak during the walk.

---

[1] All further statutory references are to the Penal Code unless stated otherwise.

At approximately 10:30 that evening, Samuel Brabenec, a homeless man who slept on the baseball field bleachers at the park, fell asleep. Later, he awoke to "long yells" and "prolonged" screams of the name "Stephen." Brabenec described the sounds as "horror" and "bloody death" screams. He also stated that there was "a little spacing" and a pause of several seconds between the screams. Brabenec later saw a figure in dark clothing walking at a "fast[] pace" across the park.

Minor A.K. lived across the street from South Weddington Park. Near midnight that evening, she and her aunt arrived home. A.K. heard loud, high-pitched screams emanating from the baseball field. The screams continued for one or two minutes while A.K. stood outside, and then for several minutes after she entered her home. A.K. heard only one voice and thought the screaming was filmmaking from the movie set.

A.K.'s aunt heard a male voice and a female voice emanating from the park. Initially, the voices were calm, but then "bickering" and "arguing" ensued for approximately 10 minutes. Then, the female screamed "help." The male voice remained "at the same monotone." At the time, A.K.'s aunt thought that the voices demonstrated "great acting" during filmmaking.

Brabenec resumed sleeping in the bleachers, but was awakened soon by another homeless man who informed him that a dead woman lay near the concession stand behind "home plate." The second homeless man telephoned for police assistance.

A responding police officer and a paramedic found the lifeless body of Patrina Sabella lying in a pool of blood near the concession stand. Los Angeles County Medical Examiner Paul Gliniecki later performed an autopsy on Sabella's body. He found 19 stab wounds to her neck, five of which were fatal punctures of her jugular vein. Sabella also suffered defensive wounds to her hands as well as blunt force injuries to her face, upper chest, and extremities. Gliniecki opined that the murder weapon probably was a knife with a thin blade that was between one and one-half and three inches long. He opined that Sabella was beaten and stabbed to death while lying on her back, and that

2

she could scream until she lost consciousness. Gliniecki found the presence of methamphetamine and amphetamine in Sabella's blood.

*Relationship Between Sabella and Joanou*

Sabella and Joanou had a casual sexual relationship. On the night of the murder, Sabella was seeking a place to "talk" with Joanou. They had exchanged text messages and telephone calls that evening concerning their plans. Sabella picked up Joanou because he did not possess a vehicle.

Prior to driving to the park, Sabella and Joanou stopped at a North Hollywood convenience store where they purchased two cups of coffee and a package of cookies. The store's security camera captured their 11:39 p.m. visit. The coffee and cookies later were found inside Sabella's vehicle. DNA analysis of one coffee cup matched Joanou's DNA profile; the cup was in the center console, near the driver. DNA analysis of the other coffee cup matched Sabella's DNA profile; that cup was on the floor near the front passenger seat. DNA later obtained from Sabella's clipped fingernails also matched Joanou's DNA profile.

Ronald DePerna was married to the grandmother of Sabella's child. He knew that Sabella and Joanou were dating. On one occasion, Joanou informed DePerna that he was homeless. In response, DePerna gave Joanou a two-and-one-half-inch folding knife to protect himself. The knife was a locking-blade knife that DePerna used in his profession as a studio lighting technician.

When police officers arrested Joanou the day following Sabella's murder, Joanou had wounds and injuries, including abrasions to his finger, knuckle, shoulder, back, and neck. During a police interview, Joanou denied killing Sabella and stated that he had not seen her for several months. He described Sabella as a friend with whom he had casual sex and stated that she was "all crazy." Joanou also admitted that he had used illegal drugs in the past and had been addicted to heroin.

*Conviction and Sentencing*

The jury convicted Joanou of first degree murder and found that he personally used a deadly weapon during commission of the crime. (§§ 187, subd. (a),

3

189, 12022, subd. (b)(1).)  The trial court sentenced Joanou to 26 years to life in prison, imposed a $280 restitution fine, a $280 parole revocation restitution fine (stayed), a $40 court security assessment, $5,000 in restitution, and a $30 criminal conviction assessment.  (§§ 1202.4, subd. (a), 1202.45, 1465.8, subd. (a), 1202.4, subd. (f); Gov. Code, § 70373.)  The court also awarded Joanou 807 days of presentence custody credit.

Joanou appeals and contends that insufficient evidence supports the judgment of first degree murder, in violation of the Fourteenth Amendment to the United States Constitution.

*DISCUSSION*

Joanou argues that there is insufficient evidence of the elements of premeditation and deliberation supporting first degree murder because he asserts that there is no evidence of careful thought and weighing of considerations regarding the killing.  He asserts that the killing is "textbook" second degree murder because it is consistent with an "explosion of violence."

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether there is reasonable and credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (2015) 60 Cal.4th 966, 988; *People v. Jackson* (2014) 58 Cal.4th 724, 749.)  Our review is the same in a prosecution primarily resting upon circumstantial evidence.  (*Johnson*, at p. 988; *People v. Watkins* (2012) 55 Cal.4th 999, 1020.)  We do not redetermine the weight of the evidence or the credibility of witnesses.  (*People v. Albillar* (2010) 51 Cal.4th 47, 60; *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact"].)  We must accept logical inferences that the jury might have drawn from the evidence although we would have concluded otherwise.  (*People v. Streeter* (2012) 54 Cal.4th 205, 241.)  "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding."  (*Albillar*, at p. 60.)

4

"[The] mental state [for first degree murder] is uniquely subjective and personal.  It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death."  (*People v. Chiu* (2014) 59 Cal.4th 155, 166.)  The process of premeditation and deliberation does not require any extended period of time.  (*People v. Watkins*, *supra*, 55 Cal.4th 999, 1026.)  The test is one of the extent of reflection and not the duration of time.  (*Ibid.*)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27, our Supreme Court identified three categories of evidence relevant to establishing premeditation and deliberation.  (*People v. Houston* (2012) 54 Cal.4th 1186, 1216; *People v. Gonzalez* (2012) 54 Cal.4th 643, 663.)  The categories include:  1) events occurring before the killing that indicate planning; 2) motive to kill; and 3) manner of killing that reflects a preconceived design to kill.  (*Ibid.*)  The factors are not exclusive nor are they invariably determinative.  (*Houston*, at p. 1216.)  Evidence of each category is not required to affirm a judgment of first degree murder.  (*People v. Mejia* (2012) 211 Cal.App.4th 586, 605.)  The factors are merely a guide in determining whether the evidence supports an inference that the killing occurred as a result of preexisting reflection rather than a rash impulse.  (*People v. Tully* (2012) 54 Cal.4th 952, 1008, fn. 24.)

Sufficient evidence supports the elements of premeditation and deliberation.  In his police interview, Joanou described a troubled relationship with Sabella, stating that they had a casual sexual relationship but that she was "crazy."  They met that evening to find "someplace to talk," according to Sabella's father.  As they walked through the park, the security guard noticed that they had serious faces and were not friendly.  At midnight, behind the concession stand, their voices became loud as they bickered and argued.  Within a short time, Sabella screamed for help; her voice became a "bloody death scream," while Joanou's voice remained a "monotone."  Sabella's screams continued for several minutes as she called his name.

Joanou beat Sabella with his fists and also stabbed her 5 times in her jugular vein, in addition to other stabbings.  The jugular vein wounds created a fatal

5

hemorrhage that caused her lack of consciousness and death. It is a reasonable inference from the evidence that Joanou opened the locking folding knife given to him by DePerna and stabbed Sabella with it. Sabella sustained many lacerations to her hands as she struggled unsuccessfully to defend herself; Joanou also suffered abrasions to his hands, arms, and neck as he beat Sabella. Selection of the lethal target of Sabella's neck as she struggled and attempted to defend herself implies preexisting reflection and a "calculated design to ensure death rather than an unconsidered explosion of violence." (*People v. Horning* (2004) 34 Cal.4th 871, 902-903 [close range gunshot to head].)

The judgment is affirmed.

NOT TO BE PUBLISHED.


GILBERT, P.J.

We concur:


YEGAN, J.


PERREN, J.


6

Gregory A. Dohi, Judge

Superior Court County of Los Angeles

_____


Robert Derham, under appointment by the Court of Appeal, for Defendant and Appellant.


Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II, Supervising Deputy Attorney General, Robert C. Schneider, Deputy Attorney General, for Plaintiff and Respondent.